# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### CLARKSBURG

**BRENDA J. JONES**

      **Plaintiff,**

**v.**                          **Civil Action No.: 1:10-CV-185**
                                      **JUDGE KEELEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17], AND AFFIRM THE RULING OF THE COMMISSIONER

## I.  INTRODUCTION

On October 27, 2010, Plaintiff Brenda J. Jones ("Plaintiff"), by counsel Travis M. Miller, Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1)  On January 21, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 9; Administrative Record, ECF No. 10)  On February 16, 2011, and April 18, 2011, the Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J.,

ECF No. 13; Def.'s Mot. for Summ. J., ECF No. 17)  On May 2, 2011, the Plaintiff filed a response to the Defendant's motion.  (Response to Motion, ECF No. 19)  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

A.    Procedural History

On September 6, 2006, the Plaintiff filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability beginning May 1, 2006.  (R. at 101-05)  Her claim was initially denied on April 26, 2007, and denied again upon reconsideration on May 30, 2007.  (R. at 56-60, 62-64)  On June 28, 2007, the Plaintiff filed a written request for a hearing, which was held in Morgantown, West Virginia, before a United States Administrative Law Judge ("ALJ") on July 10, 2008.  (R. at 27-53, 65)  The Plaintiff, represented by Travis M. Miller, Esq., appeared and testified at the hearing.  (R. at 13)  Larry M. Bell, an impartial vocational expert, also appeared at the hearing but was not called to testify.  Id.  Following the ALJ hearing, the Plaintiff submitted additional medical evidence, which was entered into the record.  Id.  On August 11, 2008, the ALJ forwarded a series of written interrogatories to the vocational expert, and on August 12, 2008, the Plaintiff submitted her own interrogatories.  (R. at 186-87, 189-90)  Larry M. Bell responded to all of the interrogatories by correspondence dated August 19, 2008.  (R. at 191-94)  On December 8, 2008, the ALJ issued an unfavorable decision to the Plaintiff, finding that she was not disabled within the meaning of the Social Security Act.  (R. at 11-25)  On September 4, 2010, the Appeals

Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-5) The Plaintiff now requests judicial review of the ALJ's decision denying her application for disability.

B.     Personal History

Brenda J. Jones was born July 7, 1958, and was 48 years old at the time she applied for DIB. (R. at 101) She graduated from high school in 1976, and has prior work experience as a receptionist and telemarketer. (R. at 124, 129) She is married and has two daughters. (R. at 47, 101-02)

C.     Medical History

The earliest medical record on file in this case is dated June 5, 2000, when the Plaintiff was evaluated by Jennifer DeFazio, a physician's assistant working for University Health Associates in Morgantown, West Virginia. (R. at 275-76) The Plaintiff complained of a funny, numb feeling in her scalp, a stiff neck, pain in her shoulders, pain around her right rib cage, and pain in her knees. (R. at 275) She stated that the pain in her knee was worse when she was walking and that she gets 10-15 minutes of morning stiffness, but the worst time of day for her pain varies. Id. Ms. DeFazio noted that the Plaintiff was 5'6.5" tall, weighed 383.5 pounds, had full and painless range of motion in all her extremities, and was grossly intact neurologically, but "did have many fibromyalgia tender points." (R. at 275-76) Ms. DeFazio opined that the Plaintiff had fibromyalgia and prescribed 10mg of Flexeril for symptom management. (R. at 276)

The Plaintiff was evaluated by University Health Associates general surgery department on October 4, 2001, for possible gastric bypass surgery. (R. at 477-80) The Plaintiff was noted to be

morbidly obese with a BMI of 63, and showed a past history of hypertension controlled by medication, fibromyalgia, depression, and arthritis. (R. at 477) At that time, the Plaintiff was working for a telemarketing firm. Id. Gastric bypass surgery was recommended, and the Plaintiff was also referred to a dietician and a psychologist. (R. at 480)

The Plaintiff visited the emergency room of St. John's Regional Medical Center in Joplin, Missouri, on October 6, 2005, for injuries sustained in a car accident. (R. at 205-11) She complained of neck and back pain and was diagnosed with cervical strain. (R. at 205, 210)

On December 8, 2005, Dr. John E. Goff, MD, of Joplin, Missouri evaluated the Plaintiff for a followup. (R. at 217-18) She complained of pain in her mid-sternum since her surgery. (R. at 217) She reported being off her medications due to cost. Id. He noted that she had surgery in Kansas City on November 17th.[1] Id.

Dr. Goff evaluated the Plaintiff on December 22, 2005, for right arm swelling. (R. at 215-16) He noted that she had injured her right forearm years ago and has occasional flare-ups. Id.

The Plaintiff was evaluated by Dr. Duane E. Myers, MD, of St. John's Regional Medical Center on January 16, 2006, for consideration of vaginal cuff radiation to prevent recurrence of a differentiated adenocarcinoma. (R. at 234-40) The Plaintiff reported mild fatigue and chronic but stable skeletal and joint pain. (R. at 236-37) The Plaintiff did not report emotional problems or a

---

[1] The undersigned was unable to locate the actual medical records from the surgical procedures performed in Kansas City, but other evidence in the record refers to a total hysterectomy and repair of a recurrent distal hernia. (R. at 227, 230, 234) Although Dr. Goff's records indicate that the surgery was performed in November, the remainder of the records reference a procedure date of October 15, 2005. (R. at 230, 234)

need for medication or psychiatric help, and Dr. Myers observed that her psychiatric examination was within normal limits. (R. at 237-38) The Plaintiff's spine exhibited no axial percussion tenderness, and her motor functions were normal. (R. at 348)

On January 23, 2006, the Plaintiff was admitted to St. John's Regional Medical Center for vaginal cylinder radiation after the removal of an adenocarcinoma. (R. at 227-28) The preoperative history and physical states that the Plaintiff weighed 408 pounds and suffered from morbid obesity, borderline diabetes, and fibromyalgia. (R. at 232)

The Plaintiff was discharged from St. John's Regional Medical Center on January 27, 2006, after receiving 70 hours of vaginal radiation treatment. (R. at 225-26) She was discharged in good condition with a good prognosis. (R. at 226)

On August 10, 2006, the Plaintiff was seen by West Preston Womens Healthcare in Reedsville, West Virginia. (R. at 243-44) The Plaintiff wanted to re-establish with a physician after moving from Missouri back to West Virginia. (R. at 243) She reported that she had a lump on her left hip that concerned her, which caused pain when she slept on that side. Id. The physician noted tenderness on her left hip at the site of the lump. (R. at 244) Her weight was recorded as 370 pounds. Id. A cytology screening for cervical cancer, conducted on August 11, 2006, was negative for malignant growths, and CT scans taken on August 28, 2006, were also negative. (R. at 245-47)

On September 6, 2006, the Plaintiff visited Dr. David Bender, MD, of Tygart Valley Total Care Clinic, for an initial visit, complaining of pelvic pain and lots of fatigue. (R. at 249-50) X-Rays of the Plaintiff's right knee showed mild joint space narrowing, moderate osteophytes in all

three joint compartments, irregular shaped calcification on the patella, and some vericose veins in the soft tissue behind the knee. (R. at 250) No definite joint effusion was seen. Id.

On October 20, 2006, Kay Means completed a physical Residual Functional Capacity ("RFC") form for the Plaintiff's disability claim. (R. at 146-53) The Plaintiff alleged high blood pressure, fibromyalgia, endometrial cancer, and moderate degenerative disease in the right knee. (R. at 153) Ms. Means determined that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk less than 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and pus/pull without limitation. (R. at 147) Ms. Means stated that the Plaintiff's 1-1.5 hour walking limitation was due to her obesity and knee arthritis. Id. The Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl. (R. at 148) She could never balance or climb ladders/ropes/scaffolds. Id. She had no manipulative, visual, or communicative limitations. (R at 149-50) She could have unlimited exposure to humidity, noise, vibration, and fumes/odors/dusts/gases. (R. at 150) She was to avoid concentrated exposure to extreme cold or heat, wetness, and hazards. Id. Ms. Means found the Plaintiff to be credible, with her allegations fully supported by medical evidence, and reduced her RFC. (R. at 153)

On November 14, 2006, Dr. Aroon Suansilppongse, MD, a state agency medical consultant, determined that the Plaintiff's medical records were insufficient to assess the musculoskeletal impairment severity of her disability claim. (R. at 251) On November 15, 2006, Dr. Ernest Atella, DO, reached the same conclusion as Dr. Suansilppongse. (R. at 252) On November 27, 2006, Dr. Maurice Prout, PhD, noted that the Plaintiff's medical report from August 10th noted depression,

and that more information would be needed to develop this aspect of her claim. (R. at 253) On December 27, 2006, Dr. Raymond Lim, MD, recommended additional X-Rays of the left hip. (R. at 254)

A request for corrective action, dated December 11, 2006, from the Philadelphia Disability Quality Branch ("DQB") determined that additional development of the Plaintiff's claim was needed prior to final determination. (R. at 154-56) The request noted discrepancies in the medical evidence that did not fully support the physical RFC completed by Ms. Means on October 20, 2006. (R. at 155) The Plaintiff had normal X-Ray views of her cervical spine on October 6, 2005. Id. She was treated for her endometrial cancer by hysterectomy on October 15, 2005, and radiation therapy on February 23, 2006. Id. Medical records dated August 10, 2006, stated that the Plaintiff did not have any gait problems and that her cancer exam was normal. Id. A cytopathology report dated August 11, 2006, was negative for cells of intraepithelial lesion or malignancy. Id. A CT scan of the Plaintiff's abdomen on August 28 2006, was normal. Id. The DQB stated that more development was needed to rate the Plaintiff's level of depression and that an orthopedic evaluation was needed to determine the degree of the Plaintiff's physical functional loss. Id.

On April 3, 2007, Dr. Kip Beard, MD, performed a medical examination of the Plaintiff. (R. at 255-60) The Plaintiff alleged high blood pressure, diagnosed in 1990; fibromyalgia, diagnosed in 1999; and endometrial cancer, diagnosed in 2004-05. (R. at 255-56) Dr. Beard observed that the Plaintiff was morbidly obese, weighing 382 pounds. (R. at 257) Her cervical spine displayed some mild pain and muscular tenderness, with normal range of motion. (R. at 258) She had mild neck

and shoulder pain during range of motion testing; mild shoulder tenderness with no redness, warmth, or swelling; no pain, tenderness, redness, warmth, or swelling in her elbows, wrists, hands, ankles, and feet; slight crepitus in her knees; and mild pain on motion testing with muscular tenderness in the lumbosacral spine/hips. (R. at 258-59) The Plaintiff complained of back pain with heel walking, toe walking, and tandem walking, but was able to do those activities. (R. at 259) She was also able to squat about two-thirds of the way with back pain, but had difficulty arising from the squat. Id. Dr. Beard diagnosed the Plaintiff with morbid obesity; endometrial cancer, status post hysterectomy and intravaginal radiation therapy; urge incontinence; hypertension; reported history of cardiac enlargement; and chronic neck and back pain with reported history of fibromyalgia. Id.

An X-Ray taken on April 10, 2007, by Dr. Eli Rubenstein, MD, showed that the Plaintiff's left hip was normal. (R. at 261)

On April 17, 2007, Dr. Cindy Osborne, DO, a state agency medical consultant, completed a Physical RFC Assessment form after reviewing the Plaintiff's disability case. (R. at 262-69) Dr. Osborne determined that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation. (R. at 263) The Plaintiff was occasionally limited in all postural categories, but had no manipulative, visual, or communicative limitations. (R. at 264-66) The Plaintiff needed to avoid concentrated exposure to extreme cold/heat, wetness, humidity, and hazards, but had no other environmental limitations. (R. at 266) Dr. Osborne noted that the Plaintiff does some household chores, takes care of her husband, drives, shops, attends church, and plays

cards. (R. at 269) Dr. Osborne found the Plaintiff mostly credible but opined that she did not meet or equal any listing and that her RFC should be decreased to light with limitations as indicated. Id. Dr. Subhash Gajendragadkar, MD, agreed with Dr. Osborne's findings in a case analysis dated May 23, 2007. (R. at 270)

The Plaintiff visited Dr. Bender on May 15, 2007, complaining of an increase in back pain and neck pain with no relief. (R. at 483) She was prescribed Ultram for her pain and advised to discontinue taking Flexeril. Id.

The Plaintiff visited Dr. Bender on June 5, 2007, complaining of pressure upon urination and back pain. (R. at 481) She was instructed to begin home glucose testing, increase physical activity, begin walking, and improve her diet. Id.

On July 18, 2007, the Plaintiff visited Dr. James A. Arnett, MD, of the Clarksburg VAMC for an initial visit. (R. at 459-64) She reported a history of fibromyalgia, hypertension, diabetes, endometrial cancer, and multiple urinary tract infections. (R. at 460) She stated she sleeps in a recliner because she becomes numb on either half of her body while laying down. Id. Although she did not have a history of formal psychiatric evaluation she had symptoms of depression relating to past marital issues and bad dreams. Id. Dr. Arnett diagnosed the Plaintiff with hypertension, type 2 diabetes mellitus, morbid obesity, a history of cardiomegaly and tachycardia, fibromyalgia, and endometrial cancer. (R. at 461) Dr. Arnett also found that the Plaintiff had a positive post-traumatic stress disorder ("PTSD") screen and recommended a followup with the PTSD screening clinic. (R. at 462)

A telephone followup note dated August 1, 2007, states that the Plaintiff was a no show for a PTSD screen group appointment. (R. at 456)

The Plaintiff was evaluated by Raj Abraham, MD, on August 15, 2007, for an oncology consult to followup on her past history of endometrial carcinoma. (R. at 340-42) Following her hysterectomy and subsequent radiation therapy, the Plaintiff moved to West Virginia and was referred to the VA oncology clinic for further followup. (R. at 341) Dr. Abraham noted the Plaintiff's weight as 398 pounds at the time of the consultation. Id. Since her radiation treatment, the Plaintiff had not had a recurrence of the disease, but Dr. Abraham recommended she be seen periodically by a gynecologist. (R. at 342)

A gastrointestinal consult report dated August 15, 2007, noted that the Plaintiff was massively obese and "tender all over." (R. at 344)

A gynecology consult dated November 29, 2007, states that the Plaintiff suffered from Type 2 diabetes and that her brother and maternal grandmother have a history of the disease. (R. at 347)

The Plaintiff was seen by the emergency department of the VA on December 8, 2007. (R. at 431-33) The Plaintiff complained of chronic low back pain, with increased pain in the right side beginning four days earlier. (R. at 432) She also reported numbness and burning in her back, pain in the groin area, difficulty walking, and inability to stand straight. Id. She also had a history of obesity, hypertension, Type 2 diabetes, fibromyalgia, and endometrial cancer. Id. She had mild to moderate tenderness in the lower back and right side, and was unable to do a straight leg test due to obesity and pain. (R. at 433) She was diagnosed with a urinary tract infection and lower back pain.

Id.  An accompanying cover note states that the Plaintiff's back pain was chronic, constant, and of a stabbing/throbbing quality.  (R. at 435)

A radiology report from December 8, 2007, noted decreased intervertebral disc space between the L5 and S1 vertebral bodies, consistent with a degenerative change.  (R. at 296) Associated facet arthropathy was seen at the L5-S1 level, and some sclerotic, degenerative change was identified at the superior aspect of the L2 vertebral body.  Id.

The Plaintiff visited Dr. Arnett on January 16, 2008, for a followup, complaining of a lot of pain.  (R. at 426-27)  She stated that her back was "unbearably painful," and that she could not stand for very long.  (R. at 426)  He noted a history of diabetes, morbid obesity, cardiomegaly, tachycardia, fibromyalgia, and endometrial cancer.  Id.  She reported really bad indigestion and chest congestion, and given her risk factors Dr. Arnett admitted her to the emergency room for observation.  (R. at 426-27)

On January 16, 2008, Kimberly L. Powell, RN, completed an inpatient admission evaluation note.  (R. at 410-18)  Ms. Powell reported that the Plaintiff had no impairment of physical activity and that she walks frequently, walking outside her hospital room at least twice per day and inside the room at least once every 2 hours during waking hours.  (R. at 414)  She further reported that the Plaintiff was slightly limited in mobility, making independent, frequent but slight changes in her body or extremity position.  Id.  The Plaintiff was able to move independently in her bed and chair, had sufficient muscle strength to lift herself completely to move, and maintained a good position in her bed or chair at all times.  Id.  She had full strength in her right and left extremities and equal

movement in her right and left extremities. (R. at 416) A similar assessment completed by Diana Hefner, RN, on January 16, 2008, found that the Plaintiff walked frequently. (R. at 418-19)

A physician admission note dated January 17, 2008, states that the Plaintiff suffered from a history of fibromyalgia and chronic back and shoulder pain. (R. at 397-98) She had a history of diabetes and essential hypertension. (R. at 397)

Dr. Arnett performed a followup evaluation of the Plaintiff on February 29, 2008. (R. at 376-79) Dr. Arnett reported that the Plaintiff "hurts all over" and was suffering from fibromyalgia. (R. at 377) He also reported that a self-assessed depression screen indicated severe depression, but that the Plaintiff was not an immediate threat to herself or others. (R. at 377-78)

A behavioral health lab consultation report, dated March 7, 2008, states that the Plaintiff was reporting passive suicidal ideation with no current plan. (R. at 318-21) The report found that, based on her reported symptoms, the Plaintiff met the criteria for a current major depressive episode, generalized anxiety disorder, and post-traumatic stress disorder. (R. at 319-20) Denise W. Donahoo, RN, recommended that she be seen by a specialty mental health provider. (R. at 319) The results of the report were based on a structured telephone interview with the Plaintiff. (R. at 321)

On June 26, 2008, Dr. Hornsby of University Health Associates wrote a letter to Dr. Arnett, advising that the Plaintiff likely has fibromyalgia because a physical examination revealed greater than 11 tender points. (R. at 474) Dr. Hornsby noted that the Plaintiff did not have synovitis of the upper or lower extremities but did snore at night. Id. Dr. Hornsby recommended that X-Rays be taken of the Plaintiff's sacroiliac joint and knees and an MRI be taken of her legs to rule out other

causes of her back pain.  Id.

Dr. Arnett completed a communication note on July 14, 2008, stating that the Plaintiff was seen by Dr. Hornsby on June 16th complaining of pain all over her body.  (R. at 588)  She was sleeping in a recliner because she becomes number when lying in bed.  Id.  Her sleep was poor and non-restorative, and she suffered from paresthesias in her right flank.  Id.

X-Rays of the Plaintiff's knees taken on July 16, 2008, showed mild asymmetric medial joint space narrowing of the left knee and degenerative osteophyte formation in the compartments of both knees.  (R. at 504-05)  Osteophyte formation or enthesophyte formation was noted around the lateral aspect of both patellae and a rounded, amorphous calcification was noted about the right knee.  (R. at 505)  The impression was degenerative articular cartilage loss in the medial compartment of the left knee, extensive bony osteophyte creation about both knees, and a possible loose body along the lateral aspect of the right knee.  Id.  These findings were deemed to be abnormalities that needed attention.  Id.

X-Rays of the Plaintiff's spine, taken on July 16, 2008, showed mild degenerative changes in the sacroiliac joints, degenerative disc disease of the lumbosacral junction, and mild facet arthropathy of the lower lumbar spine. (R. at 505-06)   These findings were deemed to be abnormalities that needed attention.  (R. at 506)

Dr. Arnett completed a primary care visit note on July 16, 2008.  (R. at 581)  The Plaintiff reported that "I have so much pain, it's unreal.  My back is really bad."  Id.  She reported being unable to stand for long periods, and that her only relief was to sit in a recliner.  Id.  She also reported

being tired all the time.  Id.  A PTSD screening test administered by Lisa R. Davisson, RN, was

negative with a score of 0.  (R. at 585)  The Plaintiff reported no changes in her ability to

independently perform activities of daily living over the previous year.  (R. at 586)

On July 16, 2008, Dr. Arnett completed a Physician's Physical Capacities Evaluation,

opining that the Plaintiff can sit 2 hours in an 8-hour work day, stand/walk 0 hours in an 8-hour

workday, sit for 5 minutes at a time without needing to change positions, and stand for 5 minutes at

a time without needing to change positions.  (R. at 495)  His opinion was based on the Plaintiff's

severe lower back pain and fatigue.  Id.  He opined that she can never lift or carry anything up to 10

pounds, but left blank the space provided to explain the reasoning for those limitations.  Id.  He

opined that the Plaintiff suffered from severe, chronic pain, objectively indicated by X-Ray

abnormalities, tenderness to palpation, and disc abnormality in the back.  (R. at 496)  He opined she

would need frequent unscheduled interruptions of work routine to leave work, would likely miss

work frequently due to pain, and would be unreliable due to her physical limitations.  (R. at 496)

On July 21, 2008, the Plaintiff received diabetes education and a clinical followup on her

diabetes.  (R. at 563-69)  She reported having fibromyalgia and a lot of pain while walking.  (R. at

566)  She also reported losing 13 pounds since February and that she was making efforts to adopt

healthier eating habits.  Id.  However, it was noted that the Plaintiff's diabetes was not controlled and

she was advised to avoid drinking some sugary juice drinks that she had substituted in her diet for

soda.  (R. at 567)

A Lumbar Spine MRI taken on August 22, 2008, showed that the Plaintiff had a mild disc

bulge at the L1-L2 location; mild narrowing, mild bulge, facet disease, and ligamentum hypertrophy in the L4-L5 location; moderate bulge, and moderate facet disease, bilateral neural foramina narrowing, and mild effacement of the exiting nerve roots of the L5-S1 location. (R. at 502) The results were consistent with degenerative changes and diagnosed as a minor abnormality. (R. at 502-03)

A nursing triage note from November 19, 2008, states that the Plaintiff complained of pain all over from fibromyalgia, affected by the weather and stress, which was of a dull aching quality. (R. at 530) Medication, rest, and elevating her feet made the pain better. Id.

E.    Testimonial Evidence

At the ALJ hearing held on July 10, 2008, the Plaintiff testified that she has not worked since her alleged onset date of May 2006, primarily due to pain. (R. at 33) Previously, she worked as a telemarketer, a secretary for Focus on the Family, and a glass cutter. (R. at 34) The most she had to lift in any of these jobs was 20 pounds, with the secretary and telemarketing jobs requiring very infrequent lifting of 10 pounds or less. (R. at 35-36)

The Plaintiff claimed that her pain got worse after her cancer surgery and now prevents her from sitting in one place. (R. at 33-34) Additionally, if she stands for any length of time, she breaks out in a cold sweat. (R. at 37) At her last job, she had to be taken off the phones because she would cry due to pain. (R. at 34) She tried to bring in a crate and a blanket to proper up her feet, but that did not give her any relief. (R. at 37) Her husband would have to come and pick her up early, and despite having an open work policy that allowed her to leave she quit because she missed large

amounts of time and was unable to make up her missed hours.  (R. at 37-38)

The Plaintiff's cancer has not recurred, but her oncologist has not been able to complete all of the required testing because of bladder infections.  (R. at 38)  She primarily complains of fibromyalgia, which she claims to cause pain in her back, legs, neck, and arms.  (R. at 39, 42)  Sitting in front of a computer makes this pain worse, and the only relief she gets comes from reclining in a padded chair at home.  (R. at 41)  She can lift a jug of milk but not on a repetitive or continuous basis because of pain in her arms.  (R. at 42)  Her physician at the VA, Dr. Arnett, referred her to a fibromyalgia specialist, but she is unable to afford the treatment.  (R. at 39-40)  Instead, she visited Dr. Hornsby at WVU, who suspected the Plaintiff's pain to be related to psoriatic arthritis.  (R. at 40-41)

The Plaintiff takes a number of medications, including sleep medication, which helps her sleep for around four hours at a time.  (R. at 42-43)  She claims to be very tired during the day, but must concentrate to try and fall asleep.  (R. at 42)  She has diabetes, and in addition to the medication she is on she is supposed to see a dietician; however, she expected to get an appointment scheduled sometime soon after the hearing.  (R. at 43)

The Plaintiff claimed that her pain affected her ability to concentrate and remember things, such as what she is talking about or writing down at any given time.  (R. at 44)  Her lack of concentration and memory would make it hard to talk to customers because she would have trouble keeping track of the conversation.  (R. at 44-45)

The ALJ asked the Plaintiff if she could perform a job similar to that of a telemarketer, but

without having to lift anything, take calls from or otherwise speak to people, and with the ability to sit or stand whenever she pleased. (R. at 45) She replied that she could not perform a job like that, as it would be similar to a voting registration job she used to work but had to decline due to pain and a frequent need to use the bathroom. (R. at 45-46) The ALJ then questioned her about her incontinence, and the Plaintiff testified that she has to use the bathroom every few hours and has accidents two to three times a week. (R. at 47)

During the day, the Plaintiff spends her time reading, watching TV, and talking on the phone with her mother. (R. at 47) Her two daughters, aged 19 and 25, live at home and perform most of the household chores, including purchasing groceries. (R. at 47-48) The Plaintiff's brother does most of the outdoor chores. (R. at 48) The Plaintiff can, however, grocery shop at Walmart or Kroger if she uses a motorized cart to ambulate. (R. at 48) She has a driver's license, and drives herself or her husband to doctor's appointments, the grocery store, or the occasional restaurant when they decide to go out to eat. (R. at 48-49) She does not belong to any clubs or organizations. (R. at 49)

Larry Bell, an impartial vocational expert, gave brief testimony at the hearing. (R. at 50-52) Mr. Bell characterized the Plaintiff's past work as sedentary, semi-skilled. (R. at 51) However, the ALJ acknowledged that new medical information had been added to the record containing information about the Plaintiff's mental impairments; this additional information was not incorporated into the ALJ's RFC hypotheticals, so the parties agreed to take the remainder of the vocational evidence at a later date through written interrogatories. (R. at 51-52)

F.    Vocational Evidence

On August 19, 2008, Larry M. Bell, an impartial vocational expert, submitted responses to written interrogatories submitted by the Plaintiff and the ALJ.  (R. at 191, 193-94)  The ALJ posed the following three questions to Mr. Bell:

1.    Assume a hypothetical individual of the claimant's age, educational background and work history who: is able to perform medium work except cannot climb ladders, ropes or scaffolds or perform balancing maneuvers; should do all walking on level and even surfaces; should not be exposed to temperature extremes, wet or humid conditions; environmental pollutants or hazards; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; should have no interaction with the general public and no more than occasional interaction with co-workers and supervisors.  Are there any jobs in the regional or national economy that such a person could perform?

2.    Reduce the exertional level in interrogatory No. 1 to light, add a sit/stand option, and the limitation that the person is only able to perform postural movements occasionally, again with no balancing or climbing of ladders, ropes or scaffolds.  Retain the other limitations.  Any jobs?

3.    Is anything in your answers to the foregoing interrogatories inconsistent with anything contained in the DOT?

(R. at 191)  In response to the first hypothetical, Mr. Bell opined that there were jobs in the economy that the Plaintiff could perform, with positions as a kitchen attendant (medium work – 950,000 jobs nationally, 6200 jobs regionally) and laundry worker (medium work – 375,000 jobs nationally, 2300 jobs regionally) available.  Id.  In response to the second hypothetical, Mr. Bell opined that the Plaintiff could perform the role of office assistant (light work – 150,000 national and 1875 regional jobs) or laundry folder (light work – 50,000 national and 650 regional jobs).  Id.  Finally, Mr. Bell

stated that his answers were not inconsistent with the DOT.  Id.

The Plaintiff, through her counsel, submitted her own hypotheticals to Mr. Bell:

Interrogatory 1

Assume a hypothetical individual of the claimant's age, education and work history who can sit for a total of two hours in an eight hour workday; and stand and/or walk for a total of zero hours in an eight hour workday.  Does this capacity allow for full time competitive work?

Interrogatory 2

Assume a hypothetical individual of the claimant's age, education and work history who will need to frequently (defined as 25% of the time) need unscheduled interruptions of work routine to leave the work station to alleviate pain, lay down and/or deal with urinary incontinence during the day.  Are there any jobs in the regional or national economy that such an individual could perform?

Interrogatory 3

Assuming the vocational expert named jobs for a hypothetical individual as described in the Judge's hypothetical number one, what is the maximum amount of time such hypothetical individual could be off task and remain employed in such jobs?

Interrogatory 4

Assuming the vocational expert named jobs for a hypothetical individual as described in the Judge's hypothetical number one, what is the maximum number of days a hypothetical individual could miss work and remain employed in such jobs?

Interrogatory 5

Assume a hypothetical individual of the claimant's age, education and work history who will miss work two or more days per month on an ongoing and consistent basis.  Are there any jobs in the regional or national economy that such an individual could perform?

(R. at 193-94)  Mr. Bell opined that were no jobs for a person under the first two hypotheticals, no

jobs for a person under hypothetical three who is off task 10% or more, and no jobs available for a

person under hypothetical five. (R. at 193-94) Mr. Bell also stated that a person would be unable

to miss more than 2 days of work under hypothetical four and still remain employed. (R. at 194)

G.      Lifestyle Evidence

The Plaintiff makes breakfast in the morning and helps her husband take his medication. (R.

at 131) She prepares meals every day, usually fixing sandwiches or using a crockpot to reduce

standing time. (R. at 133) She cleans the dishes and tries to do some small cleaning jobs around the

house. (R. at 131, 133) Her daughter does most of the laundry, but with breaks the Plaintiff can

help. (R. at 133) Regardless of what she is doing, she has to take many breaks due to pain, sitting

down in her recliner every 15 minutes. Id. She cannot do yard work and does not do other jobs, like

bathing the dog, that require her to get on her knees. (R. at 132, 134) She can, however, kneel at

the altar at church. (R. at 136)

The Plaintiff can drive a car and goes shopping once a week at Wal-Mart, where she can use

an electric cart. (R. at 134) Her daughter, however, does most of the shopping. Id. The family eats

out for dinner, and has done so more often since the Plaintiff's injury. (R. at 133)

The Plaintiff likes to sing, watch television, and play cards against friends. (R. at 135) She

attends church three times a week, and plays cards once a month. Id. Singing is difficult because

she cannot stand for very long, and she prefers to play cards at her home because she can sit in her

own chair. Id.

The Plaintiff cannot sleep in a bed because turning on her side causes her to go numb. (R.

at 132)  Instead, she sleeps in a recliner.  Id.

### III.  CONTENTIONS OF THE PARTIES

The Plaintiff, in her motion for summary judgment, alleges that the ALJ's decision is not

supported by substantial evidence and is not based upon the correct application of the law.  (Pl.'s

Mot. for Summ. J. 1, ECF No. 13)  Specifically, the Plaintiff alleges that the ALJ:

•        failed to properly weigh the opinion of Dr. James A. Arnett, her treating physician; and

•        failed to properly assess her credibility.

(Pl.'s Br.. in Supp. of Mot. for Summ. J. 4-14, ECF No. 14)  The Plaintiff requests that the Court

reverse the decision of the Commissioner and award benefits or, alternatively, remand the case for

further proceedings.  (Pl.'s Mot. for Summ. J. 1, ECF No. 13)

In contrast, the Defendant alleges in his motion for summary judgment that the decision

denying the Plaintiff's claim for DIB benefits is supported by substantial evidence and should be

affirmed as a matter of law.  (Def.'s Mot for Summ J.1, ECF No. 17)  The Defendant argues that:

•        substantial evidence supports the ALJ's determination that Dr. Arnett's opinion was not
         entitled to controlling weight; and

•        substantial evidence supports the ALJ's assessment of the Plaintiff's credibility.

(Def.'s Mem. in Supp. of Mot. for Summ. J. 8-14, ECF No. 18)

### IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in

a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.   Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the

national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

B.    The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1. **The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits throughout the "period at issue" herein, i.e., since March 1, 2006.** (R. at 16)

2. **The claimant has not engaged in "substantial gainful activity" at any time during the period at issue (20 CFR §§ 404.1520(b) and 404.1571 *et seq.*).** (R. at 16)

3. **During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: degenerative disc disease of the cervical and lumbar spine; osteoarthritis, right knee; history of multiple arthralgias/probable fibromyalgia; history of hypertension, controlled; history of gastroesophageal reflux disease, controlled; non-insulin-dependent diabetes mellitus, controlled; morbid obesity; history of endometrial cancer, in sustained remission; and major depressive/generalized anxiety/posttraumatic stress disorder(s) (20 CFR § 404.1520(c)).** (R. at 16)

4. **During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525, and 404.1526).** (R. at 17)

5. **Throughout the period at issue, the claimant has had at least the residual functional capacity to perform, within a low stress environment, a range of "unskilled" work activity that: requires no more than a "light" level of physical exertion; affords the option to sit or stand; requires no balancing, no climbing of ladders, ropes or scaffolds, and no more than occasional performance of other postural movements (i.e., climbing**

ramps/stairs, crawling, crouching, kneeling or stooping); affords even, level surfaces for all required walking; entails no significant exposure to temperature extremes, humid/wet conditions or hazards (e.g., dangerous moving machinery, unprotected heights); entails no production line type of pace or independent decision making responsibilities; and involves only routine, repetitive instructions and tasks that entail no interaction with the general public and no more than occasional interaction with coworkers and supervisors (20 CFR § 404.1520(e)). (R. at 17-18)

6.     Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of any "vocationally relevant" past work (20 CFR § 404.1565). (R. at 23)

7.     The claimant during the period at issue is appropriately considered for decisional purposes initially as a "younger individual" and upon and after her attainment of age of 50 in July 2008, an "individual closely approaching advanced age" (20 CFR § 404.1563). (R. at 23)

8.     The claimant has attained a "high school" education and is able to communicate in English (20 CFR § 404.1564). (R. at 23)

9.     The claimant has a "skilled/semi-skilled" work background but has throughout the period at issue lacked the residual functional capacity to engage in and sustain any "skilled" work activity on a competitive basis. Thus, she has acquired no particular skills that are transferable to any job that has remained within her residual functional capacity to perform during such period (20 CFR § 404.1568). (R. at 23)

10.    Considering the claimant's applicable age categories, level of education, work experience and prescribed residual functional capacity, she has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 404.1560(c) and 404.1566) (R. at 23)

11.    The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since May 1, 2006 (20 CFR § 404.1520(g)). (R. at 25)

C.    The ALJ Properly Rejected the Opinion of Dr. Arnett Because Substantial Contradictory Evidence From the Record Was Discussed by the ALJ and the ALJ Was Not Required to Specifically Discuss Each of the Section 1527(d) Factors In His Decision

The Plaintiff's first assignment of error is that the ALJ did not properly consider the opinion of her treating physician, Dr. Arnett.  (Pl.'s Br. in Supp. of Mot. for Summ. J. 4-7, ECF No. 14) Specifically, the Plaintiff contends that the ALJ's opinion is deficient because it does not rebut Dr. Arnett's opinion with "persuasive contradictory evidence" and does not contain a factor-by-factor discussion of the five underlying factors used to weigh medical opinions.[2]  (Pl.'s Br. in Supp. at 5) After reviewing the ALJ's decision and the relevant law, the undersigned Magistrate Judge finds that the ALJ provided adequate explanation as to why he rejected Dr. Arnett's opinion and accordingly finds the ALJ's analysis to be supported by substantial evidence.

Title 20, Part 404, Section 1527(d) of the Code of Federal Regulations governs how the Social Security Administration weighs medical opinions.  Unless controlling weight is assigned to a treating source's medical opinion, the following factors are considered in deciding how to weigh any medical opinion:  (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. § 1527(d); see also Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006) (listing

_____

[2] The undersigned notes that the Plaintiff, in her reply brief, specifically abandoned any argument that Dr. Arnett's opinion was entitled to controlling weight under the "treating physician rule" contained in 20 C.F.R. § 1527(d).  (See Pl.'s Response to Def.'s Mot. for Summ. J. 2, ECF No. 19 ("First, the Commissioner's attempt to frame the issue here is [sic] a matter of 'controlling weight' is misleading and inaccurate."))  Instead, the Plaintiff has focused on the ALJ's decision to completely reject Dr. Arnett's opinion.  Id. ("Thus, the issue here is not one of 'controlling weight' as the Commissioner contends.  The ALJ here entirely rejected Dr. Arnett's opinion.")

the § 1527(d) factors). Social Security Ruling 96-2p specifically addresses the explanation of the weight given to a treating source's medical opinion when that opinion is not given controlling weight and the ALJ's decision is a denial of benefits, stating that:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. See Pinson v. McMahon, 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

    1.    <u>The ALJ Did Discuss Evidence That Contradicted Dr. Arnett's Opinion</u>

First, the ALJ properly rebutted Dr. Arnett's opinion by including in his discussion the contradictory medical evidence and opinions of Drs. Bender and Beard as well as the findings of the state agency medical consultants that evaluated the Plaintiff's claim. "[The attending physicians rule] requires that the opinion of a claimant's treating physician be given great weight and may be disregarded only if there is persuasive contradictory evidence." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). However, contrary to the Plaintiff's assertions, the ALJ included in his discussion the following evidence that contradicts the severity of Dr. Arnett's findings:

- At an initial visit with Dr. Bender on September 6, 2006, the claimant complained primarily of pelvic pain and fatigue, and imaging taken of her right knee revealed "moderate"

degenerative osteophytes at all three joint compartments and calcification lateral to the patella "of uncertain etiology"; (R. at 21)

- The Plaintiff was evaluated on April 5, 2007, by Dr. Kip Beard, M.D., who determined that the Plaintiff had a normal gait and no shortness of breath; was comfortable while seated but "uncomfortable" while supine with complaints of back pain; was able to stand unassisted, rise from a seat and step up and down from the examination table without difficulty; and had mild cervical and lumbar spine pain and muscular tenderness, but no spasm, nerve root impingement, or myelopathy; (R. at 21-22)

- A State Agency disability adjudicator and two State Agency physicians respectively concluded in October 2006, April and May 2007 that the Plaintiff remained capable of performing a significant range of "light" exertional work activity; (R. at 22)

Although the above evidence shows that the Plaintiff suffered from some degenerative problems and pain in her knees and back, the undersigned finds that it also contradicts Dr. Arnett's opinion that the Plaintiff has chronic severe pain, can only sit or stand for 5 minutes at a time, and could lift nothing and carry nothing. In fact, Dr. Beard found that the Plaintiff suffered from only mild pain, and the state agency consultants found the Plaintiff capable of performing a reduced range of light work. The ALJ, therefore, was justified in rejecting Dr. Arnett's opinion in favor of the other substantial evidence in the record.[3]

---

[3] The undersigned notes that the Defendant's brief cites to other substantial evidence in the record that contradicts Dr. Arnett's opinion. The undersigned does agree with the Plaintiff that such evidence is not set forth in the decision and thus cannot be relied upon as substantial evidence to support the ALJ's decision; however, the ALJ was not required to mention every

## 2. The ALJ Adequately Explained His Reasons For Rejecting Dr. Arnett's Opinion

Second, the Plaintiff contends that the ALJ failed to set forth an adequate discussion of his reasons for rejecting Dr. Arnett's opinion. (Pl.'s Br. in Supp. of Mot. for Summ. J. 5, ECF No. 14) In support, the Plaintiff suggests that Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006) imposes on the ALJ a requirement to provide a factor-by-factor discussion of the § 1527(d) factors used in weighing medical evidence. Id. The undersigned finds this argument to be without merit because the ALJ was not required to discuss the § 1527(d) factors in his decision and gave adequate reasons for why he rejected Dr. Arnett's opinion.

As a threshold matter, the undersigned finds that the ALJ was not required to provide an extensive factor-by-factor discussion of the § 1527(d) factors. Hines v. Barnhart dealt with the Plaintiff's ability to rely on his own subjective complaints of pain after establishing that he has an objectively-verifiable medical condition that could cause that pain. See Hines, 453 F.3d at 563-66. Nowhere in the Hines decision does the Fourth Circuit discuss the § 1527(d) factors, let alone mandate a "required four step analysis" as suggested by the Plaintiff. In fact, the Hines court's reference to the § 1527 factors cites Johnson v. Barnhart, a per curiam opinion that merely listed the factors and did not even reach the issue of whether the ALJ properly evaluated the treating source opinion. See Johnson v. Barnhart, 434 F.3d 650, 655 (4th Cir. 2005) (per curiam) (finding the treating source assessment to be irrelevant to the claim but stating in dicta in a footnote that substantial evidence supported the ALJ's findings because the treating physician's opinion conflicted

piece of evidence in the record to support his decision and sufficient evidence was included to allow this Court to determine the ALJ's reasoning.

with other medical evidence). Although the ALJ must consider the factors in weighing the evidence, the only requirement imposed upon the ALJ in writing his decision is that he give good reasons and be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." See 20 C.F.R. § 1527(d)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

Turning to the merits of the Plaintiff's objection, the ALJ noted that Dr. Arnett's opinion is "inadequately supported by objective medical findings" and that the limitations assessed therein "appear inherently inconsistent and inadequately supported by medical or other evidence of record." (R. at 22) As discussed supra, the preceding paragraphs of the ALJ's discussion mention medical records that show that the Plaintiff suffered from only mild pain and was capable of performing a reduced range of light work. Additionally, the ALJ noted that the record lacked any medical explanation for why the Plaintiff was able to perform "substantial gainful activity" from 2002 through 2006, yet could not perform that same work after moving from Missouri to West Virginia in May 2006. (R. at 23) The undersigned finds that the ALJ implicitly considered the § 1527(d) factors and found that the supportability and consistency factors weighed against accepting Dr. Arnett's opinion – his opinion was not supported objectively, other evidence in the record contradicted his findings, and the Plaintiff inexplicably stopped working without some evidence showing why. Although the ALJ did not set those factors out explicitly in rejecting Dr. Arnett's opinion, the level of explanation given is adequate to allow for review and thus complies with the explanation requirements contained in the regulations and SSR 96-2p. See Pinson v. McMahon, 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed

the treating source's opinion even though he did not list the five factors and specifically address each one). For all of the reasons stated above, the undersigned finds that the ALJ's explanation for rejecting Dr. Arnett's opinion is supported by substantial evidence.

D.    The ALJ Properly Evaluated the Plaintiff's Subjective Complaints of Pain

The Plaintiff's second assignment of error is that the ALJ failed to support his analysis of the Plaintiff's credibility with substantial evidence. (Pl.'s Br. in Supp. at 7-12) In support of this contention, the Plaintiff argues that:

•    The ALJ required objective evidence of pain and thereby committed an error of law; (Pl.'s Br. in Supp. at 8)

•    The ALJ ignored key pieces of evidence that contradicted his conclusions; (Pl.'s Br. in Supp. at 8-9)

•    The ALJ made up the idea that the Plaintiff was exaggerating her symptoms for financial gain; and (Pl.'s Br. in Supp. at 9-10)

•    The ALJ relied on improper reasoning to support his negative credibility finding; (Pl.'s Br. in Supp. at 10-12).

The undersigned finds that the ALJ properly evaluated the Plaintiff's credibility because he did not require objective proof of pain and relied upon substantial evidence in determining that the Plaintiff's credibility was suspect.

1.    The ALJ Did Not Require Objective Evidence of the Plaintiff's Pain

The Plaintiff argues that the ALJ required her to produce objective evidence of the severity of her pain and symptoms in order for her to be found credible. (Pl.'s Br. in Supp. of Mot. for

Page 31 of 42

Summ. J. 8, ECF No. 14)  The undersigned finds that the Plaintiff is incorrect – the ALJ has a duty to consider objective medical evidence at step two of the credibility analysis, and in this case his credibility determination is not based solely on a lack of such evidence.

The following two-step process is used in evaluating the credibility of a claimant's subjective complaints of pain or other symptoms:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the individual's pain or other symptoms. . . . If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  **For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limited effects of pain or other symptoms are not substantiated by objective medical evidence**, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (emphasis added).  At the first step of the analysis, the Plaintiff must produce some objective medical evidence of a condition reasonably likely to cause the pain claimed; after overcoming that initial threshold, the Plaintiff may choose to rely solely upon her own subjective complaints as evidence.  Hines v. Barnhart, 453 F.3d 559, 565 (4th

Cir. 2006).

At the outset, the undersigned notes that the ALJ is not per se barred from referring to objective medical evidence at step two of the credibility determination. SSR 96-7p, quoted supra, clearly contemplates consideration of objective evidence in evaluating the severity of symptoms, and SSR 90-1p, the predecessor rule to SSR 96-7p, clearly shows that the ALJ must consider such evidence if it is available:

> FOURTH CIRCUIT STANDARD: Once an underlying physical or ental [sic] impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. **Objective medical evidence of pain, its intensity or degree** (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), **if available, should be obtained and considered.** Because pain is not readily susceptible of objective proof, however, **the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.**

SSR 90-1p, 1990 WL 300812, at *1 (Aug. 6, 1990) (emphasis added); see also Hines v. Barnhart, 453 F.3d 559, 564-65 (4th Cir. 2006) (quoting SSR 90-1p). Both the Craig and Hines courts also acknowledge the importance of objective medical evidence in their analyses:

> This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. **They most certainly are.**

Hines v. Barnhart, (quoting Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996)) (emphasis added). As stated recently in a decision from our sister district in southern West Virginia, "[t]he only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain

itself is not supported by objective medical evidence."  Walker v. Astrue, 5:09-01128, 2011 WL

1229992, at *9 (S.D.W.Va. Mar. 31, 2011).

Concerning the merits of her objection, the Plaintiff states that the following passage from

the ALJ's decision shows that he required objective evidence of her pain and symptoms:

> In the opinion of the Administrative Law Judge, the foregoing circumstances and
> evidence serve to render the claimant's underlying credibility significantly suspect,
> *in the absence of **objective medical findings that clearly support her contention** as
> to her compensable disability status since May 1, 2006.*  The undersigned does not
> believe that the record contains sufficient *objective medical findings* to offer such
> support.

(Pl.'s Br. in Supp. 8) Considering that the ALJ may make reference to objective evidence at step two

of the credibility analysis, it is clear to the undersigned that the ALJ did not require objective medical

evidence but simply noted as part of his reasoning that there was no objective medical evidence

supporting the Plaintiff's complaints.  The ALJ's main reason for discounting the Plaintiff's

credibility is the fact that she performed substantial gainful activity as a telemarketer up until the date

that she moved from Missouri to West Virginia,[4] then simply stopped working.  (See R. at 19-20)

---

[4] As one portion of her argument for why the ALJ's credibility determination is
erroneous, the Plaintiff argues that Exhibit 2E/2, which states that the Plaintiff stopped working
in part because she moved from Missouri to West Virginia, is "an unsigned document completed
by an unknown source" that "has no evidentiary value."  (Pl.'s Br. in Supp. 10)  Notwithstanding
the fact that the Plaintiff herself cited to this same document for information regarding her
current motion, the undersigned finds no merit to the Plaintiff's objection because the rules of
evidence do not apply to Social Security administrative hearings and anything in the case record
may be used to support the ALJ's decision.  See 42 U.S.C. § 405(b)(1) ("Evidence may be
received at any hearing before the Commissioner of Social Security even though inadmissible
under rules of evidence applicable to court procedure."); see also 20 C.F.R. § 1512(b) ("Evidence
is anything you or anyone else submits to us or that we obtain that relates to your claim.").  Other
courts have specifically held that hearsay evidence is admissible at an administrative hearing on
social security disabilities claims if the evidence is relevant, and the undersigned finds that the

The ALJ's reasoning is not confined to the passage quoted by the Plaintiff but rather is set forth across four paragraphs of the decision, noting that the Plaintiff continued to work right up to her move from Missouri to West Virginia, that she subsequently stopped working, that just prior to moving to West Virginia she sought medical treatment only for "general health issues," and that no real explanation was given for why she became unable to work after moving to West Virginia. Id. The ALJ determined that a reasonable explanation for these occurrences is that "the claimant's August 2006 disability benefit application was motivated more by immediate financial concerns (following her move to West Virginia from Missouri) than any actual impairment-related inability to perform any type of gainful work activity."[5] At no point did the ALJ indicate that he found the Plaintiff not credible solely because she could not produce objective proof of her symptoms.

2. The ALJ Was Not Required to Accept the Credibility Determinations of the State Agency Consultants

---

information contained in Exhibit 2E/2 is relevant to the present claim. See Tyra v. Sec'y, Health & Human Servs., 896 F.2d 1024 (6th Cir. 1990); see also Diabo v. Sec'y, Health, Educ, & Welfare, 627 F.2d 278 (C.A.D.C. 1980) (Evidentiary objection that disability reports from two private insurance carriers were inadmissible hearsay and improperly authenticated were specious as the strict rules of evidence applicable in the courtroom are not to operate at social security disability hearings so as to bar admission of otherwise pertinent evidence.).

[5] The Plaintiff argues that the ALJ simply "made up" this determination, and that there is not a shred of evidence to support his conclusion that the Plaintiff's application was motivated primarily by secondary gain. (Pl.'s Br. in Supp. 9-12) However, it is the ALJ's duty, and not the duty of this court, to draw conclusions from the evidence, and the undersigned cannot say that the conclusions drawn by the ALJ as to the Plaintiff's credibility were "patently wrong" so as to require reversal. See Sencindiver v. Astrue, Civil Action No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D.W.Va. February 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)) ("We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'").

The Plaintiff next argues that the ALJ ignored the opinions of the state agency consultants[6] who previously found her credible and disabled. (Pl.'s Br. in Supp. of Mot. for Summ. J. 8-10, ECF No. 14) The Plaintiff's objection to the ALJ's failure to favorably construe these opinions in making his credibility determination is without merit. "An ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, 5:09CV55, 2011 WL 541125, at *3 (N.D.W.Va. Feb. 8, 2011) (citing Darvishian v. Geren, 2010 WL 5129870, at *9 (4th Cir. Dec. 14, 2010). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Ryan, 2011 WL at *3 (quoting Sec'y of Labor v. Mutual Mining, Inc., 80 F.3d 110, 113 (4th Cir. 1996). The ALJ noted that the state agency consultants all found that the Plaintiff was capable of performing a reduced range of light work: "[a] State Agency disability adjudicator/analyst and two State Agency physicians respectively concluded in October 2006, April and May 2007 that the claimant remained capable of performing a significant range of 'light' exertional work activity (Exhibits 5E, 12F and 13F)." (R. at 22) Although the evidence, as suggested by the Plaintiff, may point to two inconsistent conclusions, the undersigned notes that the ultimate functional findings contained in those reports support the ALJ's decision. Accordingly, the undersigned finds no reversible error in the ALJ's rejection of the credibility determinations made by the state agency consultants.

3.    The ALJ Did Not Commit Reversible Error in Assessing the Plaintiff's Fibromyalgia

---

[6] Throughout this section of her motion, the Plaintiff also references the ALJ's exclusion of Dr. Arnett's opinion. The undersigned addressed the ALJ's treatment of Dr. Arnett's opinion supra, and will not reiterate that analysis here.

The Plaintiff next argues that the ALJ made a number of errors in his assessment of the Plaintiff's fibromyalgia. (Pl.'s Br. in Supp. of Mot. for Summ. J. 12-13, ECF No. 14) The Plaintiff argues that:

- the ALJ's statement in his step two findings that the Plaintiff has "probable fibromyalgia," rather than simply stating that she had fibromyalgia, shows that he did not consider her condition as severe;

- the ALJ incorrectly found that the record lacked any evidence that the Plaintiff met 11 of the 18 tender points used by the American College of Rheumatology in diagnosing fibromyalgia; and

- the ALJ, in discounting the Plaintiff's credibility, relied on his unsupported lay opinion that fibromyalgia is best treated by increasing physical activity;

The undersigned finds that all three of these objections constitute harmless error because the ALJ clearly considered fibromyalgia in determining the Plaintiff's severe impairments and her RFC. Additionally, the ALJ relied not on his lay opinion but on substantial evidence in the record in discounting the Plaintiff's credibility.

"The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); Hurtado v. Astrue, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("The court acknowledges there may be situations in which an error

in an opinion is harmless because it would not change the outcome of the ALJ's decision"); cf. Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.").

First, the Plaintiff is correct in noting that the ALJ failed to identify the report of Dr. Hornsby, who wrote to Dr. Arnett that she had identified greater than 11 of the 18 fibromyalgia tender points in a physical examination of the Plaintiff. (R. at 474-75) Additionally, the court's own review of the record revealed that Dr. Defazio also found that the Plaintiff had many fibromyalgia tender points. (R. at 275-76) However, the ALJ clearly stated in his step two findings that the Plaintiff had "probable fibromyalgia," and gave a detailed discussion in his RFC determination of his reasons for finding that her fibromyalgia was not disabling.

Second, the Plaintiff is correct in noting that the ALJ's lay opinion as to the proper way to alleviate fibromyalgia symptoms (i.e., increase physical activity), is unsupported by testimony or other evidence in the record. (See R. at 20) However, this brief statement appears to be nothing more than dicta; as already discussed supra, the ALJ based his credibility determination on other substantial evidence in the record – primarily her unexplained inability to work after moving from Missouri to West Virginia and the fact that she continues to perform a number of daily activites. (R. at 20)

Third, the Plaintiff makes no colorable objection to the ALJ's step two determination that

the Plaintiff had "probable fibromyalgia." The ALJ included fibromyalgia as a severe impairment at step two and continued to discuss fibromyalgia at length in his RFC determination. Accordingly, the undersigned finds that the ALJ considered the Plaintiff's fibromyalgia as a severe impairment at the applicable steps of the evaluation process.

As outlined above, the undersigned finds that the errors raised by the Plaintiff concerning the ALJ's fibromyalgia analysis are harmless, and remanding the decision for consideration of those errors would not affect the outcome of the disability determination.[7]

---

[7] The Plaintiff also incorrectly discounts the importance of a claimant's credibility in evaluating fibromyalgia in disability claims. First, the ACR study cited in the Plaintiff's brief specifically sets forth a diagnostic procedure that incorporates the Plaintiff's own subjective pain responses into the diagnosis, requiring completion of a Regional Pain Scale (referred to as a WPI scale in the study) as part of the diagnostic criteria. Frederick Wolfe et al., The American College of Rheumatology Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity, 62 ARTHRITIS CARE & RESEARCH 600, 602 (2010). The courts – including courts in this district – also recognize the subjectivity of fibromyalgia symptoms:

> Its cause or causes are unknown, there is no cure, and, **of greatest importance to disability law, its symptoms are entirely subjective**. There are no laboratory tests for the presence or severity of fibromyaligia [sic]. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other disease of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyaligia) that when pressed firmly cause the patient to flinch. **All of these symptoms are easy to fake**, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch . . . .

Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996) (emphasis added); see also Kandel v. Astrue, 1:09CV31, 2010 WL 1369080, at *20-21 (N.D.W.Va. Mar. 31, 2010) (quoting Sarchet). In any event, even if the ALJ finds that the Plaintiff suffers from fibromyalgia (which in this case, he did at step two), the ALJ must still evaluate the credibility of the Plaintiff in determining if her fibromyalgia causes pain that is disabling.

D.    The Evidence Submitted to the Appeals Council Was Not New and Material

As her final assignment of error, the Plaintiff argues that the additional evidence submitted to the Appeals Council constitutes new and material evidence.[8]  The undersigned agrees with the Defendant that the evidence is either cumulative, duplicative, or would not have changed the outcome of the case.

The Appeals Council must consider evidence submitted with the request for review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision."  Wilkins v. Sec'y, Dept. of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)).  "Evidence is new within the meaning of this section if it is not duplicative or cumulative."   Wilkins, 953 F.2d at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome."  Wilkins, 953 F.2d at 96.

After examining the records submitted to the Appeals Council, the undersigned agrees with the Defendant that the materials are either cumulative, duplicative, or would not change the outcome of the decision.  First, as noted by the Defendant, some of these records were already a part of the record at the time the ALJ issued his decision.  (Compare R. at 277-83, 353-72 to R. at 506-13, 593-614) (duplicate records)   Second, many of the other records submitted have no bearing on the Plaintiff's disabling conditions.  (See R. at 514-17, 523-24, 526-29, 531-50, 552-62, 571-80, 582-87,

---

[8] The Plaintiff's brief does not specifically contend that the Appeals Council was required to review the ALJ's decision.  However, the Plaintiff's brief refers to the evidence as "new and material" and states that the evidence was submitted pursuant to 20 C.F.R. § 404.976, which details the Appeals Council review procedures.

589-614) Third, the remaining records which do pertain to the Plaintiff's alleged impairments actually undermine Dr. Arnett's opinion rather than support it. Dr. Arnett's opinion cites "severe lo back pain; fatigued" as reasons for his functional limitations; however, the only indication of either of these conditions in his treatment notes comes the <u>subjective</u> portion of those notes, which contain statements from the Plaintiff.[9] (<u>See</u> R. at 581) ('I have so much pain, it's unreal. My back is really bad.' . . . Tired all the time also.") In fact, the objective portion of Dr. Arnett's note finds only "[t]ender lo back midline," makes no findings on fatigue, and his assessment contains no diagnosis of back pain or fatigue. (<u>See</u> R. at 581, 583) Furthermore, as noted by the Defendant, the MRI and X-Ray results cited by the Plaintiff found only minor or moderate abnormalities, and other records show that her diabetes was non-insulin dependent and under control. (<u>See</u> R. at 502-05, 558, 606) Accordingly, the undersigned finds that the additional medical records submitted fail to support Dr. Arnett's opinion or otherwise provide support for the Plaintiff's claims.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that the Defendant's Motion for Summary Judgment (ECF No. 17) be **GRANTED**, the Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, and the Decision of the Administrative Law Judge be affirmed and this case **DISMISSED WITH PREJUDICE**.

---

[9] The undersigned notes that Dr. Arnett's treatment notes are in the standard SOAP format, which stands for subjective, objective, assessment, and plan. The individual sections are clearly labeled in the record by Dr. Arnett. (<u>See</u> R. at 581-84)

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **20th** day of **May**, **2011**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE