IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BRENDA J. JONES,

            Plaintiff,

v.                          CIVIL ACTION NO. 1:10CV185
                                (Judge Keeley)

COMMISSIONER OF SOCIAL
SECURITY,

            Defendant.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

        Pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b), and L.R. Civ. P. 4.01(d), on October 27, 2010, the Court referred this Social Security action to United States Magistrate David J. Joel with directions to submit proposed findings of fact and a recommendation for disposition.

        On May 5,2011, Magistrate Judge Joel filed a Report and Recommendation ("R&R") (Dkt. No. 20), which recommended that the Court deny Brenda J. Jones's motion for summary judgment and grant the Commissioner of Social Security's ("Commissioner") motion for summary judgment. In accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 6(e), the R&R directed the parties to file any written objections with the Clerk of Court within fourteen (14) days after being served with the R&R. On June 6, 2011,  Travis M. Miller, counsel for the plaintiff, Brenda J. Jones ("Jones"), filed objections to the Magistrate Judge's R&R (Dkt. No. 21).

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

I.  **PROCEDURAL BACKGROUND**

On September 6, 2006, Jones filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability beginning May 1, 2006. (Tr. 101-05). On April 26, 2007, the Commissioner initially denied her claim and on May 30, 2007, denied it again on reconsideration. (Tr. 56-60, 62-64). Following a June 28, 2007 written request for a hearing, an Administrative Law Judge ("ALJ") conducted a hearing in Morgantown, West Virginia, on July 10, 2008, at which Jones, represented by counsel, appeared and testified. (Tr. 13, 27-53, 65). An impartial vocational expert ("VE") also appeared at the hearing but did not testify. (Tr. 13).

During the hearing, the ALJ noted that, shortly beforehand, Jones had submitted a substantial amount of additional evidence that he had not had the opportunity to review. The ALJ, therefore, postponed the VE's testimony. (Tr. 52). By letter dated July 18, 2008, counsel for Jones forwarded to the ALJ the office treatment notes of David Bender, M.D., from January 16, 2007 through June 5, 2007, and a Physician's Physical Capacities Evaluation form from James A. Arnett, M.D., Veterans Administration Medical Center – Clarksburg, dated July 16, 2008. (Tr. 185).

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

On August 11, 2008, the ALJ served interrogatories containing his hypotheticals on the VE (Tr. 186), and on August 12, 2008, counsel for Jones served his own set of interrogatories with hypotheticals to the VE. (Tr. 189-90). On August 19, 2008, the VE responded in writing to all of the interrogatories. (Tr. 191-94).

In a decision dated December 8, 2008, the ALJ determined that Jones was not disabled within the meaning of the Social Security Act. (Tr. 11-25). On September 4, 2010, the Appeals Council denied Jones's request for review, thus making the ALJ's denial of benefits the final decision of the Commissioner. (Tr. 1-5). On October 27, 2010, Jones filed this action seeking judicial review of the Commissioner's final decision denying her application for disability. (Dkt. No. 1).

## II.  PLAINTIFF'S BACKGROUND

On September 6, 2006, the date on which Jones applied for DIB, she was 48 years old. (Tr. 101). She has a high school diploma and can communicate in English. Her work experience includes employment as a receptionist and a telemarketer. (Tr. 124, 129).

### III.  ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520, the ALJ made the following findings:

1.    Jones met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through March 1, 2006;

2.    Jones had not engaged in substantial gainful activity at any time during the period at issue;

3.    During the period at issue, Jones had degenerative disc disease of the cervical and lumbar spine, osteoarthritis, right knee, history of multiple arthralegias/probable fibromyalgia, history of hypertension, controlled, history of gastroesophageal reflux disease, controlled, non-insulin-dependent diabetes mellitus, controlled, morbid obesity, history of endometrial cancer, in sustained remission, and major depressive/generalized anxiety/postraumatic stress disorder(s), that, when considered alone or in combination, did not present symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525 and 204.1526);

4.    Throughout the period at issue, Jones retained the residual functional capacity to perform, within a low stress environment, a range of "unskilled" work activity requiring no more than a light level of physical exertion, affording the option to sit or stand, requiring no balancing, climbing of ladders, ropes or scaffolds, and no more than occasional

performance of other postural movements (i.e., climbing ramps/stairs, crawling, crouching, kneeling or stooping), affords even level surfaces for all required walking, entailing no significant exposure to temperature extremes, humid/wet conditions or hazards (e.g., dangerous moving machinery, unprotected heights), entailing no production line type of pace or independent decision making responsibilities, and involving only routine, repetitive instructions and tasks that entail no interaction with the general public and no more than occasional interaction with coworkers and supervisors (20 CFR 404.1520(e));

5.     Throughout the period at issue, Jones lacked the ability to fully perform the requirements of any "vocationally relevant" past work (20 CFR § 404.1565);

6.     During the period at issue, Jones was considered a "younger individual" and upon and after July 2008 an "individual closely approaching advanced age" (20 CFR § 404.1563);

7.     Jones has a high school education and is able to communicate in English (20 CFR § 404.1564);

8.     Jones has no transferable skills from any past relevant work (20 CFR § 404.1568);

9.     Considering age, education work experience and the residual functional capacity, Jones retained the capacity to perform jobs that exist in significant numbers within the national economy (20 CFR §§404.1560 and 404.1566); and

10.    Jones was not under a "disability," as defined in the Social Security Act, at any time since May 1, 2006 (20 CFR 404.1520(e)).

(Tr. 13-25).

IV. **PLAINTIFF'S OBJECTIONS**

According to Jones, the magistrate judge erred in determining that the ALJ had properly weighed the treating physician's opinion and had a reasonable basis to question her credibility. She argues that the ALJ failed to identify medical evidence in the record that was inconsistent with her treating physician's opinion, and that, in fact, the ALJ failed to cite to any medical evidence at all. (Dkt. No. 21 at 1-2). She also argues that the evidence of record does not substantially support the ALJ's determination that she lacked credibility. Finally, she contends that, in some instances, the R&R is based on an incorrect application of the law. Id. at 5-6.

V. **RELEVANT MEDICAL EVIDENCE**

1. A June 5, 2000 office note from Jennifer DeFazio, a physician's assistant at University Health Associates ("UHA") indicating that Jones complained of a funny, numb feeling in her scalp, a stiff neck, pain in her shoulders, pain around her right rib cage, and pain in her knees that was worse when walking, and 10-15 minutes of morning stiffness. A physical examination revealed a height of 5'6.5", a weight of 383.5 pounds, full and painless

range of motion in all extremities, a grossly intact neurological examination and many fibromyalgia tender points. The diagnosis was fibromyalgia for which the doctor prescribed 10mg of Flexeril for symptom management (Tr. 275-76);

2.    An October 4, 2001 report from the general surgery department of UHA regarding an examination for possible gastric bypass surgery that contained a history of morbid obesity, a BMI of 63, a past history of hypertension controlled by medication, fibromyalgia, depression, and arthritis, a recommendation for gastric bypass surgery and a referral to a dietician and a psychologist (Tr. 477-80);

3.    An October 6, 2005 report from the emergency room of St. John's Regional Medical Center ("SJRMC") in Joplin, Missouri, indicating treatment for injuries sustained in a car accident, complaints of neck and back pain and a diagnosis of cervical strain (Tr. 205-11);

4.    A December 8, 2005, report from John E. Goff, M.D. of Joplin, Missouri, indicating that Jones had complained of pain in her mid-sternum since her surgery in Kansas City on November 17,

2005[1], and a report that she had stopped taking her medications because she was unable to purchase them (Tr. 217);

5.    A December 22, 2005 report from Dr. Goff, indicating that Jones complained of right arm swelling from a flare-up of an OLD injury to her right forearm and a sore throat.  The doctor ordered an x-ray of the arm and prescribed Biaxin (Tr. 215-16);

6.    A January 16, 2006 report from Duane E. Myers, M.D. of SJRMC, concerning an evaluation for vaginal cuff radiation to prevent recurrence of a differentiated adenocarcinoma. Jones reported mild fatigue and chronic, but stable, skeletal and joint pain, no emotional problems or need for medication or psychiatric help. Physical examination revealed no axial percussion tenderness in her spine and normal motor functions (Tr. 234-40);

7.    A January 23, 2006, report from the SJRMC, indicating that Jones had received vaginal cylinder radiation after the removal of an adenocarcinoma. The preoperative history indicated a diagnosis of morbid obesity (weight 408 pounds), borderline diabetes, and fibromyalgia (Tr. 227-32);

---

[1] The record is unclear regarding the exact date and type of surgery performed in Kansas City.

8

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

8. A January 24, 2006 discharge summary from SJRMC, indicating a history of morbid obesity, borderline diabetes, and fibromyalgia. The physical examination revealed a weight of 408 pounds, blood pressure 186/107, a supple neck with no lymphadenopathy in lymph nodes, including cervical, supraclavicular, clear lungs, healed vaginal cuff with no abnormal findings otherwise, no cyanosis, clubbing or edema in extremities and musculoskeletal tenderness without actual percussion. The laboratory testing revealed a BUN and creatinine level of 13 and 0.7. respectively, a calcium at 9.1, negative HCG, potassium at 3.8, white count of 8.8, H and H of 14/40, and platelets 219,000. Review of a July 22, 2005 chest x-ray from SJRMC revealed no acute or active disease (Tr. 233);

9. A January 27, 2006 discharge report from SJRMC, indicating that Jones had received 70 hours of vaginal radiation treatment and was discharged in good condition with a good prognosis (Tr. 225-26);

10. An August 10, 2006, report from West Preston Women's Healthcare in Reedsville, West Virginia, indicating that Jones had complained of a lump on her left hip that caused pain when she slept on that side. On physical examination Jones weighed 370

pounds, had a blood pressure of 126/84, complained of tenderness on her left hip at the site of the lump, had a supple neck with full range of motion, normal pelvic examination, and soft, nontender abdomen with no palpable masses (Tr. 243-44);

11.  An August 11, 2006 cytology screening report from Grafton City Hospital ("GHC") for cervical cancer, which reflected a negative finding for malignant growths (Tr. 245-47);

12.  An August 28, 2006 report from CT scans taken at West Virginia University Hospitals, Inc. ("WVUH"), indicting they were negative for cells of intraepithelial lesion or malignancy (Tr. 245-47);

13.  A September 6, 2006 report from David Bender, M.D., Tygart Valley Total Care Clinic ("TVTC") on an initial visit, indicating that Jones complained of pelvic pain, pain in her left hip with numbness and stinging and "lots of fatigue." The physical examination revealed a weight of 390 pounds and a blood pressure of 160/100. Dr. Bender ordered x-rays of her right knee and a follow-up appointment in three weeks (Tr. 249-50);

14.  A September 6, 2006 X-Ray report of Jones's right knee from GHC, indicating mild joint space narrowing, moderate osteophytes in all three joint compartments, irregular shaped

calcification on the patella, and some vericose veins in the soft tissue behind the knee.  No definite joint effusion was seen (Tr. 250);

15. An October 20, 2006, Physical Residual Functional Capacity ("PRFC") form from Kay Means,[2] indicating a history of high blood pressure, fibromyalgia, endometrial cancer, and moderate degenerative disease in the right knee. The report further indicated that Jones could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk less than 2 hours in an 8-hour workday due to obesity and knee arthritis, sit about 6 hours in an 8-hour workday, could push/pull without limitation, could occasionally climb ramps, stairs, stoop, kneel, crouch, and crawl, could never balance or climb ladders, ropes or scaffolds, had no manipulative, visual, or communicative limitations, could have unlimited exposure to humidity, noise, vibration, and fumes, odors, dusts or gases, and must  avoid concentrated exposure to extreme cold or heat, wetness, and hazards. Means reduced Jones's RFC[3] after determining

_____

[2] The record indicates only that Ms. Means was a medical consultant.

[3] The record does not indicate the amount of this reduction to Jones's RFC.

that Jones was credible and the medical evidence of record supported her allegations (Tr. 146-53);

16. A November 14, 2006 report from Aroon Suansilppongse, M.D., a state agency medical consultant, indicating that Jones's medical records were insufficient to permit an assessment of the severity of any musculoskeletal impairment. He recommended an orthopedic evaluation with functional capacity assessment with full range of motions studies (Tr. 251);

17. A November 15, 2006 report from Ernest Atella, D.O., indicating that he concurred with Dr. Suansilppongse's opinion that Jones's medical records were insufficient to assess the severity of any musculoskeletal impairment. He recommended an appropriate orthopedic evaluation with the necessary testing, such as range of motion, reflexes, muscle strength, and any other testing deemed to be necessary (Tr. 252);

18. A November 27, 2006 report from Maurice Prout, Ph.D, indicating that Jones's medical report dated August 10th from West Preston Healthcare noted depression, and that more information would be needed regarding its severity and impact, if any, on Jones's social functioning and concentration, persistence and pace (Tr. 253);

19.  A December 27, 2006, report from Dr. Raymond Lim, MD, indicating agreement with the recommendation for development of further information and recommending X-Rays of the left hip (Tr. 254);

20.  A December 11, 2006, request for corrective action from the Philadelphia Disability Quality Branch ("DQB"), indicating that additional development was needed prior to final determination.  It noted that the medical evidence contained discrepancies that did not fully support the October 20, 2006 physical RFC completed by Ms. Means. It specifically referenced October 6, 2005 normal X-Rays of her cervical spine, an October 15, 2005 hysterectomy for endometrial cancer followed by radiation therapy on February 23, 2006, August 10, 2006 medical records indicating no gait problems and a normal cancer exam, an August 11, 2006 cytopathology indicating negative results for cells of intraepithelial lesion or malignancy, and an August 28, 2006 CT scan of the abdomen that indicated normal findings. It further indicated the need for more mental health and orthopedic development to determine the level of her depression, as well as the degree, if any, of loss of physical function (Tr. 154-56);

21.  An April 5, 2007 report from Kip Beard, M.D., indicating that Jones had reported a 1990 diagnosis of high blood pressure, a 1999 diagnosis of fibromyalgia, and a 2004-05 diagnosis of endometrial cancer. A physical examination revealed morbid obesity, weight of 382 pounds, mild cervical pain and muscular tenderness with normal range of motion, mild neck and shoulder pain during range of motion testing, mild shoulder tenderness with no redness, warmth, or swelling, no pain, tenderness, redness, warmth, or swelling in her elbows, wrists, hands, ankles, and feet, slight crepitus in her knees, mild pain on motion testing with muscular tenderness in the lumbosacral spine/hips, back pain with heel walking, toe walking, and tandem walking, ability to squat about two-thirds of the way with back pain, and difficulty arising from the squat. Diagnoses included morbid obesity, endometrial cancer, status post hysterectomy and intravaginal radiation therapy, urge incontinence, hypertension, reported history of cardiac enlargement, and chronic neck and back pain with reported history of fibromyalgia (Tr. 255-60);

22.  An April 10, 2007 X-Ray report from Dr. Eli Rubenstein, MD, indicating that the soft tissues about the hip are normal, no

articular alterations, no fracture, dislocation or destructive lesion, and acetabular fossa appear normal (Tr. 261);

23.  An April 17, 2007, Physical Residual Functional Capacity Assessment ("PRFC") from Dr. Cindy Osborne, DO, a state agency medical consultant, indicating that Jones could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation, can occasionally climb ramps, stairs, ladders, ropes or scaffolds, can occasionally, balance, stoop, kneel, crouch or crawl, no manipulative, visual, or communicative limitations, and must avoid concentrated exposure to extreme cold/heat, wetness, humidity, and hazards but no other environmental limitations.

Dr. Osborne noted that Jones was able to perform some household chores, could care for her husband, drive, shop, attend church, and play cards.  She determined that Jones's "complaints are mostly credible but do not meet or equal any listing. Decrease RFC to light with limitations as indicted" (Tr. 262-69);

24.  A May 24, 2007 case analysis from Dr. Subhash Gajendragadkar, MD, indicating agreement with Dr. Osborne's PRFC findings (Tr. 270);

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

25.  A May 15, 2007 office note from Dr. Bender indicating that Jones complained of increased back and neck pain with no relief. The physical examination revealed a weight of 400 pounds, a blood pressure of 132/80 and reported blood sugars over 200.  Dr. Bender prescribed Ultram for her pain  and discontinued Flexeril because Jones reported that it made her sleepy (Tr. 483);

26.  A June 5, 2007 office note from Dr. Bender, indicating that Jones complained of pressure upon urination and back pain. He instructed her to begin home glucose testing, increase physical activity, begin walking, and improve her diet (Tr. 481);

27.  A July 18, 2007, report from an initial appointment with Dr. James A. Arnett, MD, of the Clarksburg Veteran's Administration Medical Center ("VAMC"), indicating a history of fibromyalgia, hypertension, diabetes, endometrial cancer, and multiple urinary tract infections. Jones reported sleeping in a recliner because she becomes numb on whichever side she lays, and, even though the record does not contain a history of a formal psychiatric evaluation, Dr. Arnett noted symptoms of depression relating to past marital issues and bad dreams.

Dr. Arnett's diagnosis was hypertension, type 2 diabetes mellitus, morbid obesity (recent weight 404 pounds), a history of

cardiomegaly and tachycardia, fibromyalgia, and endometrial cancer, and a positive post-traumatic stress disorder ("PTSD") screen. He recommended a followup with the PTSD screening clinic and a consultation with the MOVE/weight management program. He stressed the importance of daily care and inspections of her feet to avoid complications from her diabetes (Tr. 459-64);

28. An August 1, 2007 telephone follow-up note from MaTrisha D. Nuzum, Clerk at Clarksburg VAMC, indicating that Jones had failed to appear for a PTSD screen group appointment scheduled for 2:00 P.M. on August 1, 2007  (Tr. 456);

29. An August 2, 2007 addendum from MaTrisha D. Nuzum, Clerk at Clarksburg VAMC, indicating that Jones called and rescheduled the PTSD screen group appointment (Tr. 457);

30. An August 15, 2007 evaluation from Raj Abraham, MD, VAMC Clarksburg, indicating an oncology consultation regarding Jones's past history of endometrial carcinoma. On physical examination Jones weighed 398 pounds, had no recurrence of the disease, and Dr. Abraham recommended periodic examinations by a gynecologist (Tr. 340-42);

31. An August 15, 2007 gastrointestinal consult report Clarksburg VAMC, indicting that Jones complained of altered bowel

movements, anal rectal discomfort, gas/bloating, and urgency and feeling of incomplete evacuation of the rectum post bowel movement. Physical examination revealed massive obese abdomen, patchy eczematoid area skin rash on both elbows, and complaints of being tender all over. The doctor recommended stool testing, blood chemistry, lactose tolerance test, a colonoscopy in the future, trial of probiotics, and use of anti hemorrhoidal ointment (Tr. 344);

32.   A November 29, 2007 gynecology consult from Clarksburg VAMC, indicating Jones complained of abdominal swelling, concern that her umbilical hernia had returned, and abdominal incision irritation. She denied any problems with her bladder or her breasts. The physical examination revealed no acute distress, a weight of 395 pounds, a blood pressure of 140/86, no CVA tenderness, and pain reported as zero on a scale of zero to ten. The diagnosis was Type 2 diabetes, history of endometrial cancer, morbid obesity, skin irritation beneath each breast, and fibrocystic changes of the breast.  The doctor recommended an annual gynecologic examination, pap smear and mammogram, regular self breast examinations, scheduled a transvaginal ultrasound, and a return appointment in six months (Tr. 347–49);

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

33.  A December 8, 2007 report from the emergency department of the VAMC, indicating that Jones complained of chronic low back pain, with increased pain in the right side beginning four days earlier, numbness and burning in her back, pain in the groin area, difficulty walking, inability to stand straight and chronic, constant back pain described as stabbing and throbbing. She reported a history of obesity, hypertension, Type 2 diabetes, fibromyalgia, and endometrial cancer. The physical examination revealed a weight of 392.9 pounds, a blood pressure of 189/104, mild to moderate tenderness in the lower back and right side, and inability to do a straight leg test due to obesity and pain. Jones was diagnosed with a urinary tract infection and lower back pain, and was discharged with instructions to take amoxicillin three times a day for 10 days for the infection, Lortab one tablet every six hours for severe back pain and to follow up with her primary care physician (Tr. 431-35);

34.  A December 8, 2007 radiology report from Clarksburg VAMC from a five view series of the lumbosacral spine, indicating decreased intervertebral disc space between the L5 and S1 vertebral bodies, consistent with a degenerative change, no other areas of decreased  vertebral body heights or intervertebral disc space

seen, associated facet arthropathy was seen at the L5-S1 level, and some sclerotic, degenerative change was identified at the superior aspect of the L2 vertebral body (Tr. 296-07);

35.  A January 16, 2008 report from Dr. Arnett regarding a followup appointment, indicating that Jones complained of a lot of "unbearable pain" and inability to stand for very long, a history of diabetes, morbid obesity, cardiomegaly, tachycardia, fibromyalgia, and endometrial cancer, and really bad indigestion and chest congestion. Based on her risk factors, Dr. Arnett admitted her for observation  (Tr. 426-27);

36.  A January 16, 2008 inpatient admission evaluation note from Kimberly L. Powell, RN, indicating that Jones complained of chest pain of one week duration. Powell's chart notes indicate no impairment of physical activity and that Jones walked outside her hospital room at least twice per day, and inside the room at least once every 2 hours during waking hours, a slight limitation in mobility that caused independent, frequent but slight changes in her body or extremity position, the ability to move independently in her bed and chair, sufficient muscle strength to lift herself completely to move, and maintenance of a good position in her bed or chair at all times, full strength in her right and left

extremities and equal movement in her right and left extremities. Diana Hefner, RN, completed a similar assessment on January 16, 2008, and indicated that Jones walked frequently (Tr. 410-19);

37.  A January 17, 2008 physician admission note from Markus K. Kung, VAMC, indicating that Jones complained of chest pain that usually occurred after eating and lasted several hours.  She reported a history of fibromyalgia, chronic back and shoulder pain, diabetes and essential hypertension. Physical examination revealed no acute distress, no thyromegaly, a blood pressure of 156/92, heart RRR at 94/min, and sinus rhythm with PVCs by bed-side monitor.  Dr. Kung assessed atypical chest pain, suspect GI origin, myocardial infaration ruled out. The plan was to discontinue the heparin drip,  proceed with the cardiac stress test, establish tight control regarding blood sugar and blood pressure, and institute aggressive weight reduction (Tr. 397-98);

38.  A February 29, 2008 follow-up evaluation from Dr. Arnett, indicating that Jones complained of hurting all over due to fibromyalgia. Dr. Arnett noted that a self-assessed depression screen indicated severe depression and recommended an evaluation by Mental Health/Behaviorial Health Lab.  He further noted that he did

not believe Jones was an immediate threat to herself or others (Tr. 377-78);

39.   A March 7, 2008 behavioral health lab consultation report from VAMC, indicating that, based on the symptoms reported during a structured telephone interview, Jones met the criteria for a current major depressive episode, generalized anxiety disorder, and post-traumatic stress disorder, and a recommendation from Denise W. Donahoo, RN, for an examination by a specialty mental health provider. The report further noted that, despite reported suicidal ideation, Jones had no current plan to harm herself (Tr. 318-21);

40.   A June 26, 2008 letter to Dr. Arnett from Jo Ann Allen Hornsby, M.D, Associate Professor Section of Rheumatology, UHA, indicating results of a June 16, 2008 examination of Jones in which she complained of pain all over her body, inability to stand without breaking out in a cold sweat, not sleeping well, sleeping in a recliner due to numbness when she lies down, chest pain and shortness of breath and getting up during the night four to five times to urinate. Because the physical examination revealed greater than eleven fibromyalgia tender points, Dr. Hornsby determined that

> [t]he   patient   likely   has   fibromyalgia,
> although she does snore. Apparently, her
> snoring has improved. I took the liberty of

beginning trazodone50 mg at bedtime and Mobic 7.5 mg daily. I did give her an information sheet on Lyrica, as she asked about that medication. I would strongly suggest evaluation as she did have some plaques on her elbows consistent with psoriasis. Certainly psoriatic arthritis can cause low back pain. I would suggest at minimum S1 joint films to look for sacroiliitis. In think she would also benefit from knee films, and I would suggest checking a sedimentation rate. As she does complain of some pain going down her legs with walking, she may need an MRI. It would be for cost issues to have these performed through you. I would certainly be happy to see her back should any of these suggest an inflammatory process or if we need to obtain these studies here.

(Tr. 474-75);

41.  A July 14, 2008 communication note from Dr. Arnett that indicated receipt of a letter from Dr. Hornsby detailing her examination of Jones on June 16th, and noting Jones's complaints of pain all over her body, having to sleep in a recliner due to increased numbness when lying in bed, poor and non-restorative sleep, and paresthesias in her right flank. Dr. Arnett also noted Dr. Hornsby's recommendations (Tr. 588);

42.  A July 16, 2008 x-ray report from bilateral, weight bearing x-rays of Jones's knees, indicating mild asymmetric medial joint space narrowing of the left knee and degenerative osteophyte

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

---

formation in the compartments of both knees, osteophyte formation or enthesophyte formation around the lateral aspect of both patellae, a rounded, amorphous calcification about the right knee, an impression of degenerative articular cartilage loss in the medial compartment of the left knee, extensive bony osteophyte creation about both knees greatest about the patellae bilaterally, and a possible intra-articular loose body along the lateral aspect of the joint on the right, abnormalities that needed attention (Tr. 504-05);

43.  A July 16, 2008 x-ray report from spine SI Joints 1 and 2, indicating mild degenerative changes in the sacroiliac joints, degenerative disc disease of the lumbosacral junction, and mild facet arthropathy of the lower lumbar spine, abnormalities that needed attention (Tr. 505-06);

44.  A July 16, 2008 primary care visit note from Dr. Arnett, indicating that Jones complained of "so much pain, it's unreal," my back is really bad, inability to stand for long periods, only relief was sitting in a recliner, and being tired all the time. Dr. Arnett noted no chest pain, no change in past twelve months in ability to independently perform activities of daily living, no falls in the past twelve months, and a negative PTSD screening test

performed by Lisa R. Davisson, RN, with a score of 0. Dr. Arnett's assessment was HTN controlled, DM2 uncontrolled, morbid obesity with good weight loss (13 pounds), fibromyalgia, history of endometrial cancer and multiple UTIs. He recommended a mammogram, which Jones refused due to inability to pay, an MRI as advised by WVU, and return in four months (Tr. 581-86);

45. A July 16, 2008 Physician's Physical Capacities Evaluation from Dr. Arnett, VAMC, indicating that, due to severe low back pain and fatigue, Jones can only sit 2 hours in an 8-hour work day, stand/walk 0 hours in an 8-hour workday, sit for 5 minutes at a time without needing to change positions, stand for 5 minutes at a time without needing to change positions, and can never lift or carry anything up to 10 pounds. He opined that Jones suffered from severe, chronic pain, objectively indicated by X-Ray abnormalities, tenderness to palpation, and disc abnormality in the back. He stated that, due to her chronic severe pain, Jones would frequently have unscheduled interruptions of work routine and would have to leave the work station to relieve the pain, would frequently likely miss work due to pain, and would be unreliable due to her physical limitations (Tr. 496);

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

46.  A July 21, 2008 report from Roxanna Pheasant, RN, CDE, VAMC,  indicting that Jones received diabetes education and a clinical follow-up regarding her diabetes. Jones reported having fibromyalgia, a lot of pain while walking, a weight loss of 13 pounds since February, and an effort to adopt healthier eating habits.  Significantly, the note indicates that Jones's diabetes was not controlled and that she was advised to avoid drinking some sugary juice drinks that she had substituted for soda in her diet (Tr. 563-69);

47.  An August 22, 2008 Lumbar Spine MRI from VAMC Clarksburg, indicating that Jones had a mild disc bulge at the L1-L2 location, mild narrowing, mild bulge, facet disease, and ligamentum hypertrophy in the L4-L5 location, moderate bulge, and moderate facet disease, bilateral neural foramina narrowing, and mild effacement of the exiting nerve roots of the L5-S1 location that are considered consistent with degenerative changes and diagnosed as a minor abnormality (Tr. 502-03); and

48.  A November 19, 2008 nursing triage note from Cindy J. Walters, BSN, VAMC Clarksburg, indicating that Jones complained of dull, aching pain all over from fibromyalgia that was affected by the weather and stress. Jones indicated that medication, rest, and

elevating her feet made the pain better. Significantly, in an addendum note regarding the possibility of Jones participating in a MOVE (weight management) program, the level of activity in which Jones could participate was noted as "light intensity (includes walking 1-2 mph, bike strength - flexibility training)" (Tr. 529-34).

## VI. **DISCUSSION**

A.   Opinion of Treating Physician Dr. Arnett

Jones contends that, in making his recommendation to affirm the ALJ's decision of no disability, the magistrate judge did not properly consider the opinion of Dr. Arnett, her treating physician at the VAMC, whom she first saw on July 1, 2007. The magistrate judge, however, determined that the ALJ had adequately explained his reasons for rejecting Dr. Arnett's opinion and that the record contained substantial evidence to support that decision. (Dkt. No. 20 at 26).

In Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006), the Fourth Circuit observed that

> [c]ourts typically 'accord' greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Id. at 563 (citing Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005).

Prior to its decision in Hines, in Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987), our circuit court held that treating source medical opinions are entitled to greater weight unless there is "persuasive contradictory evidence" in the record. (emphasis added).

Pursuant to Social Security Ruling 96-2p, when an ALJ does not assign controlling weight to a treating physician's opinion, he

> will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
>
> When the determination or decision:
>
> *is not fully favorable, e.g. is a denial; or
>
> *is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individuals' remaining ability to function;
>
> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion(s), . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any

28

---

> subsequent reviewers the weight the adjudicator gave to
> the treating source's medical opinion and the reasons for
> that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

Title 20, Part 404, Section 1527(d) of the Code of Federal Regulations provides that, "unless controlling weight is assigned to a treating source's medical opinion," an ALJ must consider certain factors when deciding the weight to be assigned to any medical opinion. These include (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. § 1527(d).

Although an ALJ must consider these factors when weighing the evidence, he is under no mandate to conduct a factor-by-factor analysis. Pinson v. McMahon, 3:07-1056, 2009 WL 763553, at *10 (D.S.C. Mar. 19, 2009). He need only be "sufficiently specific to make clear to any subsequent reviewers the weight he gave to the treating source's medical opinion and the reasons for that weight." 20 C.F.R. § 1527(d)(2); and SSR 96-2p at *5.

Here, as in Pinson, the ALJ failed to extensively discuss the specific factors in § 1527(d), and how they related to the facts in

Jones's case. Nevertheless, the ALJ did reference the following evidence contradicting the degree of severity found by Dr. Arnett:

1.  The September 6, 2006 report from Dr. Bender following Jones's initial visit, in which Jones complained primarily of pelvic pain and fatigue and x-rays of her right knee taken that day revealed "moderate" degenerative osteophytes at all three joint compartments and calcification lateral to the patella "of uncertain etiology" (Tr. 21);

2.  The April 5, 2007 report from Dr. Kip Beard, M.D., reflecting that Jones had a normal gait, no shortness of breath, was comfortable while seated but "uncomfortable" while supine with complaints of back pain, was able to stand unassisted, rise from a seat and step up and down from the examination table without difficulty, and had mild cervical and lumbar spine pain and muscular tenderness, but no spasm, nerve root impingement, or myelopathy (Tr. 21-22); and

3.  An October 2006 State Agency disability adjudicator's report and two State Agency physicians' reports dated April and May 2007, respectively, reflecting that Jones

remained capable of performing a significant range of "light" exertional work activity (Tr. 22).

The ALJ also noted that the record lacked any medical explanation as to why Jones was able to perform "substantial gainful activity" from 2002 through mid-2006, but not after she moved from Missouri to West Virginia in May 2006.(Tr. 23). Indeed, as reported by Dr. Beard, Jones suffered from only mild pain, and the state agency consultants determined that she retained the ability to perform a reduced range of light work. (Tr. 22). This evidence contradicts Dr. Arnett's opinion that Jones had chronic severe pain, could sit or stand for only 5 minutes at a time, and could not lift or carry anything.

Even though the ALJ did not perform a detailed factor-by-factor analysis, he clearly considered the five factors from § 1527(d) in his evaluation of Jones's claim, and, after doing so, determined that substantial evidence in the record contradicted Dr. Arnett's opinion. After careful review, the magistrate judge determined that the ALJ's explanation allowed a subsequent reviewer to follow his line of reasoning and, thus, complied with the requirements of § 1527(d)(2) and SSR 96-2p. Upon de novo review, this Court agrees that there was sufficient persuasive

contradictory evidence in the record to rebut Dr. Arnett's opinion, and that the ALJ provided an adequate path for subsequent reviewers to follow how he weighed the evidence in relation to his findings.

B.    Credibility Analysis

Jones argues that the evidence does not substantially support the ALJ's finding that she was not credible. She alleges that, when the errors are taken as a whole, the ALJ's credibility finding is based on "an incorrect application of the law" in some instances and, therefore, is "flawed and unsupportable." (Dkt. No. 21 at 5-6)

1.    Objective Evidence of the Plaintiff's Pain

According to Jones, the ALJ required her to produce objective evidence of severe pain and symptoms. (Plaintiff's Objs. p. 6) The magistrate judge, however, determined that, as required, the ALJ considered objective medical evidence at step two of his credibility analysis, and did not base his credibility determination solely on a lack of objective evidence. (R&R 32)

SSR 96-7p establishes a two-step process for evaluating the credibility of a claimant's subjective complaints of pain or other symptoms:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

First, the adjudicator must consider whether there is an
underlying medically determinable physical or mental
impairment(s) – i.e., an impairment(s) that can be shown
by medically acceptable clinical and laboratory
diagnostic techniques – that could reasonably be expected
to produce the individual's pain or other symptoms. . .
. If there is no medically determinable physical or
mental impairment(s), or if there is a medically
determinable physical or mental impairment(s) but the
impairment(s) could not reasonably be expected to produce
the individual's pain or other symptoms, the symptoms
cannot be found to affect the individual's ability to do
basic work activities.

Second, once an underlying physical or mental
impairment(s) that could reasonably be expected to
produce the individual's pain or other symptoms has been
shown, the adjudicator must evaluate the intensity,
persistence, and limiting effects of the individual's
symptoms to determine the extent to which the symptoms
limit the individual's ability to do basic work
activities. **For this purpose, whenever the individual's
statements about the intensity, persistence, or
functionally limited effects of pain or other symptoms
are not substantiated by objective medical evidence**, the
adjudicator must make a finding on the credibility of the
individual's statements based on a consideration of the
entire case record. This includes the medical signs and
laboratory findings, the individual's own statements
about the symptoms, any statements and other information
provided by treating or examining physicians or
psychologists and other persons about the symptoms and
how they affect the individual, and any other relevant
evidence in the case record.

SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (emphasis added).

In <u>Hines</u>, the Fourth Circuit held that, once a claimant

satisfies the threshold step of the SSR 96-7p analysis, he may

choose to rely solely on his own subjective complaints as proof of the alleged pain and its effects on his ability to do basic work. 453 F.3d at 565. As the magistrate judge noted, however, SSR 96-7p does not bar an ALJ from referring to objective medical evidence. Indeed, SSR 90-1p, the predecessor rule to SSR 96-7p, established that, where objective medical evidence is available, the ALJ must consider it.

> FOURTH CIRCUIT STANDARD: Once an underlying physical or ental [sic] impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. **Objective medical evidence of pain, its intensity or degree** (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), **if available, should be obtained and considered.** Because pain is not readily susceptible of objective proof, however, **the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.**

SSR 90-1p, 1990 WL 300812, at *1 (Aug. 6,1990) (emphasis added); accord Hines, 453 F.3d at 564-65.

Before its decision in Hines, in Craig v. Chater,76 F.3d 585, 595 (4th Cir. 1996), the Fourth Circuit recognized the importance

of objective medical evidence as an aid to an ALJ's analysis of pain and its relationship to a claimant's impairment:

> This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. **They most certainly are.**

Id. (emphasis added).

In Walker v. Astrue, No. 5:09-01128, 2011 WL 1229992, at *9 (S.D.W. Va. Mar. 31, 2011), the court noted that "[t]he only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence." Despite Jones's assertions otherwise, that is certainly not the case here. Although the ALJ did state

> the foregoing circumstances and evidence serve to render the claimant's underlying credibility significantly suspect, *in the absence of* ***objective medical findings that clearly support her contention*** *as to her compensable disability status since May 1, 2006. . . ,* The undersigned does not believe that the record contains sufficient *objective medical findings* to offer such support. . . .

his ultimate conclusion regarding Jones's credibility covers four paragraphs in which he noted, among others, that Jones continued to work right up to her move from Missouri to West Virginia. She then

stopped working, although immediately prior to that move, she had sought medical treatment only for "general health issues." She never offered any real explanation "for why she became unable to work after moving to West Virginia." (Tr. at 19-20).

Pursuant to SSR 96-7p, an ALJ may consider and analyze available objective evidence at step two of his credibility analysis. Here, after a thorough review of the evidence of record, Magistrate Judge Joel concluded that the ALJ had properly examined the objective evidence of record, had analyzed and considered Jones's subjective allegations, and had not required her to submit objective medical proof of her subjective allegations. As to the ALJ's determination that Jones's testimony about the intensity and persistence of her pain was "motivated more by immediate financial concerns (following her move to West Virginia from Missouri) than any actual impairment-related inability to perform any type of gainful work activity," he concluded that "at no point, did the ALJ indicate that he found the Plaintiff not credible solely because she could not produce objective proof of her symptoms." (Dkt. No. 20 at 35).

    2.    State Agency Consultants' Credibility Determinations

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
<hr>

Jones contends that the ALJ ignored the opinions of state agency consultants who previously had found her credible and determined she was disabled. (Dkt. No. 21 at 9).

20 CFR § 416.927(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultant or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether you are disabled . . . .

Significantly, the April 17, 2007, Physical Residual Functional Capacity Assessment ("PRFC") from Dr. Cindy Osborne, DO, a state agency medical consultant, indicated that Jones "was mostly credible," and also reflected that her impairments did not meet or equal any listing. It included a recommendation to decrease Jones's RFC to light, with the limitations indicated in the PRFC. (Tr. 262-69). The May 24, 2007 case analysis from Dr. Subhash

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Gajendragadkar, M.D., another state agency consultant, agreed with

Dr. Osborne's PRFC findings.

    In Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D.W.

Va. Feb. 8, 2011), the court held:

> An ALJ's credibility determinations are
> 'virtually unreviewable' by this Court.
> Darvishian v. Geren, 2010 WL 5129870, at *9
> (4th Cir. Dec. 14, 2010) citing Bieber v.
> Dept. of the Army, F.3d 1358, 1364 (Fed.Cir.
> 2002). An ALJ's findings will be upheld if
> supported by substantial evidence. See Milburn
> Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th
> Cir. 1998). Substantial evidence is that which
> a 'reasonable mind might accept and "[T]he
> possibility of drawing two inconsistent
> conclusions from the evidence does not prevent
> an administrative agency's findings from being
> supported by substantial evidence." Ryan,
> 2011 WL at *3 (quoting Sec'y of Labor v.
> Mutual Mining, Inc., 80 F.3d 110, 113 (4th
> Cir. 1996) (quoting Consolo v. Fed. mar.
> Comm'n., 383 U.S. 607, 620 (1966). Finally,
> this Court notes that an ALJ 'is not required
> 'to use particular format in conducting his
> analysis,' but the decision must demonstrate
> 'that there is sufficient development of the
> record and explanation of findings to permit
> meaningful review.' Moore v. Astrue, 2010 WL
> 3394657, *6 n. 12 (E.D. Va. July 27, 2010
> (quoting Jones v. Barnhart, 364 F.3d 501, 505
> (3d Cir. 2004).

Id. at *3-*4.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Here, in any case, the ultimate conclusion of the state agency consultants was that Jones retained the ability to perform a reduced range of light work. (Tr. Exs. 5E, 12F & 13F).

3.  <u>Plaintiff's Fibromyalgia</u>

Jones contends that the magistrate judge erroneously adopted the ALJ's assessment of her fibromyalgia. She argues that the ALJ 1) did not consider her fibromyaliga to be severe, as evidenced by his statement at step two of his sequential analysis that she had "probable fibromyalgia;" 2) incorrectly determined that the record did not contain any evidence that she met the 11 of 18 tender points used by the American College of Rheumatology for a diagnosis of fibromyalgia points; and 3) discounted Jones's credibility and chose to rely on his own lay opinion that fibromyalgia is best treated by increasing the claimant's physical activity. (Dkt. No. 20 at 37).

The magistrate judge concluded that, at most, these issues constituted harmless error because the ALJ clearly had considered Jones's fibromyalgia as a severe impairment at step two of his analysis. Additionally, as already noted, his credibility analysis was based on evidence in the record.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

"The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); Hurtado v. Astrue, No. 1:09-1073, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("The court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision"); cf. Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.")

Jones correctly notes that the ALJ failed to acknowledge Dr. Hornsby's letter to Dr. Arnett, in which Hornsby reported that, in a physical examination of Jones, she had identified greater than 11 of the 18 fibromyalgia tender points. (Tr. 474-75). The ALJ also

failed to acknowledge a report from Dr. DeFazio, finding Jones had many fibromyalgia tender points. (Tr. 275-76). Nevertheless, in his consideration of the evidence at step two of the sequential analysis, the ALJ acknowledged that Jones had "probable fibromyalgia" and explained in a detailed discussion of his RFC determination why her fibromyalgia was not disabling. (Tr. 16-17).

As Jones points out, the ALJ did state that he believed one of the ways to alleviate fibromyalgia symptoms was to increase physical activity: this dicta, however, was not of consequence to the ultimate nondisability determination. As discussed earlier, the ALJ based his credibility determination on substantial evidence in the record, primarily Jones's unexplained sudden inability to work after moving from Missouri to West Virginia, as well as her documented ability to perform a number of daily activities. (Tr. 20). Accordingly, from his review of the evidence of record, the magistrate judge concluded that the ALJ had properly considered and weighed the impact of Jones's fibromyalgia as a severe impairment at the applicable steps of the evaluation process.

Courts have recognized the subjectivity of fibromyalgia's symptoms:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Its cause or causes are unknown, there is no cure, and, **of greatest importance to disability law, its symptoms are entirely subjective**. There are no laboratory tests for the presence or severity of fibromyaligia [sic]. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other disease of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyaligia) that when pressed firmly cause the patient to flinch. **All of these symptoms are easy to fake**, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch . . . .

Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996) (emphasis added); see also Kandel v. Astrue, No. 1:09CV31, 2010 WL 1369080, at *20-21 (N.D.W. Va. Mar. 31, 2010) (quoting Sarchet, 78 F.3d at 306-07). In Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986), moreover, the Fourth Circuit held that a mere diagnosis of a condition is not enough to prove disability. Importantly, there must be a showing of related functional loss. As the Seventh Circuit observed in Sarchet:

The record before the administrative law judge consisted of Sarchet's testimony plus the reports of several doctors who had examined her. . . . But they disagreed about the extent to which her ability to move around is limited by the effect of movement on her 'pain all over' or by muscular weakness resulting from tenderness, fatigue, and

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

limited mobility.  Sarchet testified that her
pain has virtually immobilized her but of
course the administrative law judge did not
have to believe her.  If the administrative
law judge believed the medical reports that
found that Sarchet has enough strength to work
and disbelieved Sarchet's own testimony, this
would compel the denial of the application for
benefits.  We cannot say that this combination
of belief and disbelief would be unreasonable
but we cannot uphold a decision by an
administrative agency, any more than we can
uphold a decision by a district court, if,
while there is enough evidence in the record
to support the decision, the reasons given by
the trier of fact do not build an accurate and
logical bridge between the evidence and the
result.

78 F.3d at 306-07 (citations omitted).

In this case, based on the ALJ's determination that Jones was
not a totally credible claimant and had the documented ability to
perform a number of daily activities, the magistrate judge
determined that any errors in the ALJ's analysis relating to her
fibromyalgia were harmless, and that remand for consideration of
those errors would not affect the outcome of the ALJ's disability
determination. The Court agrees with this analysis and concludes
that the ALJ provided an accurate and logical bridge evaluating the
evidence and the results he reached. Id.

## VII. CONCLUSION

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

In objecting to the magistrate judge's recommendation, the plaintiff, Brenda J. Jones, has not raised any issues that were not thoroughly considered by Magistrate Judge Joel in his R&R. Therefore, following an independent, <u>de novo</u> consideration of the matter, the Court concludes that the R&R accurately reflects the law applicable to the facts and circumstances in this action, **ADOPTS** Magistrate Judge Joel's Report and Recommendation in its entirety (Dkt. No. 20), and

1.  **GRANTS** the defendant's motion for Summary Judgment (dkt. no. 17);

2.  **DENIES** the plaintiff's motion for Summary Judgment (dkt. no. 13); and

3.  **DISMISSES** the case **WITH PREJUDICE** and **RETIRES** it from the docket of this Court.

It is so **ORDERED**.

Pursuant to Fed. R. Civ. P. 58, the Court directs the Clerk of Court to enter a separate judgment order and to transmit copies of this Order to counsel of record.

DATED: March 30, 2011.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE